# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PITTSFIELD DEVELOPMENT, LLC,   )
PITTSFIELD RESIDENTIAL II, LLC, and  )
PITTSFIELD HOTEL HOLDINGS, LLC,  )
            )
      Plaintiffs,   )
            )
    v.        )   17 C 1951
            )
CITY OF CHICAGO,     )
            )
      Defendant.   )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant City of Chicago's ("City") Motion to Dismiss ("Motion") Plaintiffs Pittsfield Development, LLC, ("Development") Pittsfield Residential Hall, LLC, ("Residential") and Pittsfield Hotel Holdings, LLC's ("Hotel") (collectively, "Pittsfield") Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the City's Motion is granted in part and denied in part.

## BACKGROUND

The Court accepts as true the following well-plead allegations from Pittsfield's Complaint and attached exhibits. All possible inferences are drawn in Pittsfield's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

On or about July 12, 2000, Development purchased the forty-story Pittsfield Building ("Building") located in downtown Chicago, Illinois. The Building has since been divided into four separate subdivisions. Development owns and operates the ground floor, all basement and sub-basement levels, floors 23—40 ("Tower"), as well as portions of floor 22. Hotel, which was organized for the purpose of constructing and operating a hotel in the Building, owns floors 2—9. Residential owns floors 10—12. Development, Hotel, and Residential are all related entities. Floors 13—21 are owned and operated by a third party, 55 E. Washington Development, LLC, and is used primarily for student housing.

At the time of purchase in 2000, the Building was zoned DX-16 Downtown Mixed Use District ("DX-16"). DX-16 zoning allowed for then, and would continue to allow for, various uses within the Building, including the build-out, ownership, and operation of a hotel and twenty-seven additional residential units. Pittsfield intended to establish a hotel on floors 2—9 and develop "spectacular city residential dwelling units" on the Tower floors.

On April 2, 2014, a letter was sent from Dennis Kulak ("Kulak"), an individual representing Pittsfield in some unclear fiduciary capacity, to the City's Zoning Administrator. The letter included a $150 review fee alongside Kulak's request for a "written opinion that a Boutique Hotel with two hundred and ten rooms would conform to the City of Chicago Municipal Zoning Ordinance." On May 1, 2014, the City's Assistant Zoning Administrator, Steven Valenziano ("Valenziano"), sent a

letter to Pittsfield indicating that "a 210-room hotel with associated hotel operations…is a permitted use in the DX-16 district and therefore would be allowed to establish by-right at the subject site."

In reliance upon the DX-16 zoning classification, "as confirmed in" Valenziano's letter, Pittsfield arranged to empty the Building of all tenants save those on floors 10—12 and certain retail tenants on the ground floor. Pittsfield then completely demolished floors 7—9 in anticipation of hotel construction on floors 2—9. As a result, Pittsfield gave up the opportunity to earn regular income from office tenants who could no longer rent space after the demolition. Pittsfield also expended professional fees and costs "in excess of hundreds of thousands of dollars" to prepare a construction permit application. On or about December 10, 2015, the City issued a building permit ("Permit") to Hotel to construct a hotel with up to 191 units on floors 2—9 of the Building.

On or about August 3, 2015 – four months before the issuance of the Permit – Pittsfield entered into a contract to sell all of its property interests in the Building to Adam David Partners, I, LLC ("Prospective Buyer") for $36,000,000. Although the parties ultimately failed to close on the sales contract, at some point, a representative for the Prospective Buyer met with Alderman Brendan Reilly to express the Prospective Buyer's interest in converting the entire building into residential units.[1]

---

[1] Whether the Prospective Buyer's discussion with Alderman Reilly occurred before or after the Pittsfield deal fell through is unclear on the face of the Complaint.

Shortly thereafter, Alderman Reilly publicly voiced his opposition to the operation of a hotel in the Building.

On February 10, 2016, two months after Hotel received the Permit and well after the demolition of floors 7—9, Alderman Reilly introduced an ordinance to the City of Chicago City Council to change the zoning of the Building ("Zoning Change") from DX-16 Downtown Mixed Use to DR-10 Downtown Residential Use ("DR-10"). Pittsfield was only made aware of the proposed Zoning Change via a notice posted on a public light pole across from the Building, notice which Pittsfield contends was improper. On March 14, 2016, the Zoning Change was recommended for approval at a meeting of the Committee on Zoning, Landmarks, and Building Standards. Pittsfield alleges that a quorum was not present at this meeting, rendering the recommendation invalid.

On or about March 16, 2016, the Zoning Change was approved by Ordinance O2016-811 of the City of Chicago ("Downzoning Ordinance"). The Downzoning Ordinance affected only the Building and changed its zoning classification from DX-16 to DR-10. Pittsfield contends that DR-10 zoning allowed for significantly less residential units to be put in the Building than already existed, essentially barring construction of new units in the Tower. Additionally, DR-10 zoning prohibited the Building from being used as a hotel, effectively revoking the Permit and requiring most of Pittsfield's property interests in the Building to sit empty; floors 10—12 and certain retail space on the ground floor were unaffected.

Almost a full year after the passage of the Downzoning Ordinance, Pittsfield engaged a broker to sell its interests in the Building at an auction held on February 28 and March 1, 2017. Pittsfield alleges that several buyers who were willing and able to make a purchase, and would have otherwise submitted offers, were uninterested in the Building because the Downzoning Ordinance restricted use of the property. Pittsfield was unable to sell the property at the auction, which it alleges effectively denied it all viable economic uses of the Building.

On March 13, 2017, Pittsfield filed its six-count Complaint. In Count I, Pittsfield seeks a declaratory judgment pursuant to 42 U.S.C. §§ 2201 and 2202 that the Downzoning Ordinance is an unconstitutional violation of (i) the due process and equal protection clauses of the Fourteenth Amendment; (ii) the Fifth Amendment's Takings Clause; and (iii) Illinois law and City ordinances requiring a quorum to be present for a Committee vote. Count II raises the same challenges but seeks injunctive relief. Count III also raises the same challenges, seeking monetary relief under 42 U.S.C. § 1983. Count IV pleads a state law inverse condemnation claim. Count V challenges the Downzoning Ordinance under a promissory estoppel theory. And Count VI is a damages claim based on purported violations of the Illinois Constitution's due process, equal protection, and takings clauses.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations, but must provide enough factual support to raise his right to relief above a speculative level. *Bell Atlantic. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim," and may be considered in a district court's ruling on a motion to dismiss. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

**DISCUSSION**

While Pittsfield requests separate forms of relief in Counts I, II, and III, all three set forth substantively identical federal constitutional claims. Therefore, rather than proceed count-by-count, the Court has organized its opinion according to the distinct legal claims that underpin Pittsfield's Complaint.

## I. State Law Inverse Condemnation Claims (Count IV) and Illinois Constitution Claims (Count VI)

Pittsfield concedes the City's position that federal damages are unavailable for the state law claims in Counts IV and VI. The City's Motion is therefore granted with respect to both counts.

## II. Fifth Amendment Takings Claims[2]

### A. Preliminary Considerations

#### i. Severability of the Building for Takings Analysis

Before we dive into the viability of the pleadings, two preliminary matters require our attention. First, for nearly all of the claims alleged, both parties treat and discuss the collected plaintiffs as one entity, Pittsfield, with one interest in the Building. For a takings analysis, however, Pittsfield contends that it can sever its property holdings among the individually named plaintiffs for "purposes of determining whether they have been denied all economically beneficial use" of each distinguishable interest in the Building – i.e., Development's interest, Hotel's interest,

---

[2] Pittsfield argues at length that its takings claims are ripe. The City states plainly that it is not seeking dismissal on ripeness grounds, and the Court sees no issue with ripeness now that it has dismissed the inverse condemnation claims. *See Daniels v. Area Plan Com'n of Allen County*, 306 F.3d 445, 457—58 (7th Cir. 2002).

and Residential's interest. The City appears to concede this position, stating in a footnote that because Residential, the owner of floors 10—12, chose not to vacate its tenants, its severable interest from Development's and Hotel's interests remains unaffected by the Downzoning Ordinance. Therefore, the City asks that the Court dismiss Residential's Fifth Amendment takings claim. Because we find no disagreement between the parties on the question of the Building's severability, we agree with both: Residential's takings claim is dismissed for failing to state a claim, and the Fifth Amendment interests of Development and Hotel will be considered separately following a more thorough discussion of the law.

### ii.    Property Interest in the Permit for Takings Purposes

The second preliminary issue is immensely thornier. Pittsfield contends that it has an additional property interest in the Permit itself,[3] separate from its interest in the Building. The City briefly opposes Pittsfield's Permit contention, declining to address the legal merits entirely. The City suggests that because Pittsfield "never claim[s] in [its] Complaint that the City has unconstitutionally taken [its] interest in the Permit…any such claim is not properly before the Court." The City also bemoans Pittsfield's failure to explain how its interest in the Permit is any different from its interest in the Building.

Before turning to the viability of Pittsfield's position, we note that the City's opposition, in and of itself, is inadequate. Pittsfield alleges in its Complaint that the

---

[3] Specifically, any property interest in the Permit would belong to Hotel, as the recipient entity of the Permit.

Downzoning Ordinance amounted to "a public taking of private property." This follows a detailed discussion of the physical changes made to the Building after receipt of Valenziano's letter, the costs incurred in anticipation of a building permit, and the City's issuance of the Permit to Hotel in December 2015. The Complaint also states, "the Permit which authorized Plaintiffs to construct a hotel on the Properties was effectively revoked, without justification." As we discuss, *infra*, according to the law developed in other circuits and suggested by the Seventh Circuit, these allegations contemplate the Fifth Amendment property interests that vest in permits.

Additionally, Pittsfield attached to its Complaint not only the correspondence that preceded the Permit's issuance, but also a copy of the Permit itself. That Pittsfield did not plead with exacting precision the legal divergence between its interests in the Building and its interest in the Permit does not diminish the obvious attention it devoted to establishing the wrongdoing befell it by the effective revocation of the Permit. At the pleadings stage, this was enough to put the City on notice that the private property at issue extended to the Permit.

To state a takings claim, however, it is not enough to merely assert that any old thing has been taken; there must be a constitutionally protected property interest at stake. "Property interests, of course, are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law…." *Board of Regents v. Roth*, 408 U.S. 564, 577 (1972). The Seventh Circuit has already concluded that local

ordinances establish a predicate for the creation of claims of entitlement to permits in particular instances. "[W]e must look to 'existing rules or understandings that secure certain benefits and that support claims of entitlements to those benefits.'" *New Burnham Prairie Homes, Inc. v. Village of Burnham*, 910 F.2d 1474, 1479 (7th Cir. 1990). "[W]here a municipal ordinance provides substantive criteria which, if met, dictate the issuance of a permit, an applicant who has met those criteria might assert a legitimate claim of entitlement to the permit." *Polenz v. Parrott*, 883 F.2d 551, 556 (7th Cir. 1989) (citing *G.T. Scott v. Greenville County*, 716 F.2d 1409 (4th Cir. 1983)).

The language of *Polenz* suggests that a "claim of entitlement" should arise in a situation like Pittfield's. *Polenz* contemplated a scenario where, had the plaintiffs provided the court with the ordinances dealing with the occupancy permits relevant to the case, the court could have determined if a permit should have been issued, and consequently if a claim of entitlement had arisen.[4] *Polenz*, 883 F.2d at 556. Here, whatever criteria Pittsfield was required to meet to obtain a building permit were clearly satisfied, since the City did issue the Permit. This takes us to a step as yet not promulgated explicitly by the Seventh Circuit, but one that logically follows the rationale of the *Polenz* and *Burnham* decisions: where a municipality takes the affirmative step of issuing a permit to a qualified recipient, a legitimate claim of entitlement has *necessarily* been created.

---

[4] Because the record was lacking in this regard, the court was "prevented from conducting a 'substantive criteria' analysis" on the matter. *Polenz*, 883 F.2d at 556.

*Polenz* and *Burnham*, however, contemplated substantive due process issues. And while their reasoning strongly suggests the creation of a property right in the municipal issuance of a permit, "property as contemplated by the Takings Clause and property as contemplated by the Due Process Clause cannot be coterminous." *Pro-Eco, Inc. v. Board of Com'rs of Jay County, Ind.*, 57 F.3d 505, 513 (7th Cir. 1995) ("*Pro-Eco II*").

This distinction is articulated in *G.T. Scott*, 716 F.2d, the Fourth Circuit case relied on by Pittsfield and cited by the *Polenz* court in support of its "substantive criteria" test. *G.T. Scott* involved a county council's "freezing" of the issuance of a building permit, "the necessary reviews" of which had otherwise been "either satisfactorily completed or waived." *Id.* at 1413. The Fourth Circuit lamented the permit's non-issuance, noting that although the plaintiff's entitlement to a permit constituted a "cognizable property interest…to which federal due process protection extended," "the permit, until it is at least actually in hand, is not in the nature of interests the deprivation of which is encompassed by the Fifth Amendment 'takings' doctrine." *Id.* at 1418—19, 1421. The court went on to clarify precisely the shortcoming that renders property interests worthy of only due process protection, and not Fifth Amendment takings shelter:

> [A] taking claim seeks to recover "just compensation" for inverse condemnation by the government. While real property and other tangibles are commonly subject to "purchase" by the state as a means of compensation, other forms of property interests—though constitutionally

protected—are not normally so conceived.  [Plaintiff's] entitlement to a permit is of this latter variety.  *Id*. at 1421 n.20.

Although it could not settle the matter definitively under the facts of *G.T. Scott*, the Fourth Circuit portended the very situation Pittsfield finds itself in now, where a permit's issuance triggers a widening of protections afforded its holder, from those of the Fourteenth Amendment to those of the Fifth.  The court stated that "[w]here a previously valid permit has issued and construction begun, a subsequent rezoning that effectively revokes permission to build is a confiscatory taking of the permit itself." *Id*. at 1421.  Here, the valid Permit had issued, demolition had already begun, significant costs were incurred, and the Downzoning Ordinance effectively revoked Hotel's permission to build.  Under *G.T. Scott*, this would constitute a confiscatory taking.

The buck does not stop, however, with the Fourth Circuit.  Indeed, in a 1981 case cited in *G.T. Scott*, the former Fifth Circuit (now Eleventh Circuit) beat the Fourth Circuit to the punch.  In *Wheeler v. City of Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. Unit B 1981), the plaintiff apartment developers were initially granted a permit to build an apartment complex.  Following a community outcry, a city ordinance was passed forbidding the construction of new apartments.  Perceiving the ban "to be a bald attempt to revoke an already authorized building permit," the former Fifth Circuit held that "if a regulatory undertaking is confiscatory in nature, it is a taking." *Id*.

It appears evident to the Court that, although the Seventh Circuit has yet to address head-on the question of whether the holder of a building permit has a Fifth Amendment property interest in the permit itself, the coherent answer is yes. The *G.T. Scott* and *Wheeler* dictates of our reviewing court's sister circuits suggest definitively that a Fifth Amendment property interest attaches to an already-issued building permit.

Only one hurdle, that of state law, remains. In *Pro-Eco II*, the plaintiff developer held an option contract to buy a plot of land in which it intended to build a landfill. *Pro-Eco, Inc.*, 57 F.3d at 509. One of the questions presented to the court was whether the option contract was "property in itself for which the owner must be compensated if its value is destroyed by a zoning regulation that goes too far." *Id*. Analogizing to a Supreme Court case born out of California, *see Nollan v. California Coastal Comm'n*, 483 U.S. 825 (1987), the court turned to state law, the breeding ground of property rights, to determine the option contract's protections under the Fifth Amendment. On similar facts to those of *Pro-Eco II*, the Supreme Court in *Nollan* found an actionable takings claim, while the Seventh Circuit in *Pro-Eco II* did not. The reason for the divergent decisions was simple: "California recognizes a compensable property right in unexercised options to purchase real estate. Indiana, apparently, does not." *Pro-Eco, Inc.*, 57 F.3d at 509 (internal citations omitted).

Taking our cue from *Pro-Eco II*, should Illinois law recognize the vesting of a property interest in a building permit issued to a property owner, the prior holdings of

the Fourth and former Fifth Circuits suggest the viability of a takings claim in the Permit itself. While the Court finds no Illinois case addressing the vesting of a property right in an already-issued permit where takings considerations are at stake, the state courts have developed a substantial body of law, primarily martialed in mandamus cases, that recognizes the potential vesting of a right in the "presuppose[d] issuance of a *legal* building permit." *Morgan Place of Chicago v. City of Chicago*, 2012 IL App (1st) 091240, ¶ 46.

In fact, "Illinois is one of the few states which recognizes that actual expenses incurred before a permit is ever granted may provide the basis for a claim to vested rights." *First Nat. Bank & Trust Co. v. City of Rockford*, 47 Ill.App.3d 131, 145 (1977). "The vesting of the right presupposes a legal building permit and a substantial change of position incurred in good faith reliance thereon by the property owner." *Ganley v. City of Chicago*, 18 Ill.App.3d 248, 254 (1974). Here, we are already one step further than the scenario contemplated by Illinois' "vested rights" doctrine. We need not question whether Pittsfield's demolition of three whole floors anticipated some presupposed permit, because an actual permit, *the* Permit, was issued after both extensive demolition and the spending of hundreds of thousands of dollars on the Permit application. As it appears that Illinois law would recognize the vesting of an actionable right in a permit that issued on the heels of considerable expenditure and construction, the tenets of *Pro-Eco II* signal the viability of the sort of regulatory takings claim already recognized in the Fourth and former Fifth Circuits.

14

Therefore, the government's effective revocation of the Permit is sufficient to suggest a confiscatory taking under the Fifth Amendment. Hotel held a constitutionally protected property interest in the Permit, and its interest therein warrants its own substantive takings analysis.

## B. Substantive Takings Claims

Substantively, Pittsfield alleges that the Downzoning Ordinance amounted to "a public taking of private property without just compensation" in violation of the Fifth Amendment. A regulatory takings claim may lie where "government regulation of private property [is] so onerous that its effect is tantamount to a direct appropriation or ouster…." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005). Of the four categories of regulatory action that "generally will be deemed *per se* takings for Fifth Amendment purposes," the parties address only one "narrow" category here: whether the City's Downzoning Ordinance "completely deprive[d] [Pittsfield] of '*all* economically beneficial use'" of its property. *Id.* at 538 (quoting *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1019 (1992).

To adequately allege the complete deprivation of all economically beneficial use of a property requires the clearing of an exceptionally high hurdle. "[I]n at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full…. Takings law is full of these 'all-or-nothing situations.'" *Lucas*, 505 U.S. at 1019 n.8. In both *Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017) and *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001), the

Supreme Court declined to find complete deprivations of economically beneficial use where the landowners at issue retained permission to build residences on their property. In both cases, neither property was resigned to sit "economically idle." *Lucas*, 505 U.S. at 1019. "In order to qualify as a regulatory taking, the measure must place such onerous restrictions on land as to render it useless." *Muscarello v. Ogle County Bd. of Com'rs*, 610 F.3d 416, 421 (7th Cir. 2010). For Pittsfield's Complaint to survive dismissal on its takings claim, it must plead sufficient facts from which the Court can reasonably infer that the Downzoning Ordinance rendered the respective implicated property interests useless.

The only other category arguably applicable, a *Penn Central* taking, requires an analysis of a "complex of factors including the regulation's economic effect on the landowner, the extent to which the regulation interferes with reasonable investment-backed expectations, and the character of the government action." *Palazzolo*, 533 U.S. at 617 (2001) (citing *Penn Cent. Transp. Co. v. City of New York*, 438 U.S. 104, 124 (1978)). However, "[a] regulatory restriction on use that does not entirely deprive an owner of property rights may not be a taking under *Penn Central*." *Horne v. Dep't of Agric.*, 135 S.Ct. 2419, 2429 (2015). Because Pittsfield does not allege that its rights in the Building or the Permit have been wholly deprived, only that the economic upshot of those rights has been nullified, we confine our analysis of the viability of Pittsfield's Complaint to its adequacy in alleging that the Downzoning

Ordinance caused a complete deprivation of the properties' economically beneficial uses.

### i.    Development's Interest in the Tower

In its Complaint, Pittsfield states that, in anticipation of hotel and residential construction on floors 2—9 and the Tower, respectively, it "arranged to empty" the Building of all tenants not located on floors 10—12.   Since the Downzoning Ordinance made construction of additional residential units in the Tower impossible, Pittsfield alleges that the Tower has been effectively forced to "sit empty."

However, in its expectation that the Building would be converted into a mixed-use edifice, Pittsfield only proceeded with actual construction efforts in Hotel's portion of the property, floors 2—9.   The Tower remained untouched, and there is nothing in the pleadings to suggest that whatever tenants occupied the Tower before the City passed the Downzoning Ordinance could not now reoccupy the space.   Or, in the alternative, that new tenants could inhabit the Tower floors in any manner Development sees fit.   In any event, the Complaint suggests that the Tower was in use before the Downzoning Ordinance, remained unchanged during all times relevant to this lawsuit, and to this day sits eminently habitable in its current form, if not in the "spectacularly residential" capacity that Pittsfield once hoped for.   The Tower is no mere vacant blight.   It is a desirably located property, readymade for habitation in at least whatever capacity it was utilized for during the first fourteen years of Pittsfield's

ownership.  That Pittsfield sought a greater value from the space in 2014 does not render automatically worthless the Tower's previous decade-plus of utility.  Because the Court is incapable of inferring from the Complaint the deprivation of all economically beneficial uses of the Tower, Development's claim of a regulatory taking is dismissed.

### ii.    Hotel's Interest in Floors 2—9

Distinct from its impact on Development's property interest, the effect that the Downzoning Ordinance had on Hotel's stake in the Building suggests a much more serious deprivation of economically beneficial use.  The City argues that because the applicable zoning code sets forth a number of permissible uses of a building zoned DR-10, including "residential units, assisted living facilities, domestic violence residences, colleges and universities, day care facilities, hospitals, schools, bed and breakfasts, and religious assemblies," *see* Municipal Code of Chicago § 17-4-0207, Pittsfield's failure to allege facts demonstrating the economic unviability of these uses is fatal to its claim.

We disagree.  Where Development had at its disposal a section of property that the alleged facts plainly demonstrate was readily suitable for occupancy, Hotel's floors 7—9 had already been "completely demolished" by the time the Downzoning Ordinance was passed.  The Court acknowledges the Complaint's regrettable omission of discussion on the effect this demolition had on floors 2—6.  But it requires precious little critical thinking to infer that the annihilation of a trio of floors

18

might have posed a serious problem for the habitability of the floors immediately below. The Tower survived the Downzoning Ordinance unscathed; Hotel's portion of the Building did not, and so its takings claim deserves a closer look.

Turning to the facts alleged, construed as true for purposes of considering the City's Motion, the Court discerns the following sequence of events as having occurred. Hotel desired to turn its portion of the Building into a hotel. The City issued to Hotel the Permit for this specific purpose. The Permit reads, in pertinent part, "Convert eight floors (2 through 9) from E-Business to A-2 Multiple Dwellings (Hotel)…." The City then passed the Downzoning Ordinance, eliminating the very possibility of the hotel's construction. Now, the City would have Pittsfield allege in exacting detail the fiscal peril of the uses that the City, by passing the Downzoning Ordinance, has confined Hotel to pursue. This despite the City's issuing a Permit to Hotel – after Hotel had already destroyed almost one full half of its physical property – sanctioning construction of the one use Pittsfield is now foreclosed from pursuing.

The City's suggestion is a drastic overstatement of what is required of plaintiffs at the pleading stage. Pittsfield was not obligated in its Complaint to detail each fiscal pitfall of the plethora of uses the City would have it utilize, uses for which any redevelopment of the physical space was unpermitted under the very terms of the City's own authorized Permit. Pittsfield alleges the passing of an ordinance disallowing the only use Hotel is authorized to build for. Pittsfield also alleges a space partially destroyed in anticipation of the hotel's eventual buildout. These

allegations are enough to permit the reasonable inference that Hotel has been deprived of all economically beneficial uses of floors 2—9. Fact discovery may well prove otherwise, but on the pleadings, Pittsfield has stated a claim that the Downzoning Ordinance effectuated a regulatory taking of Hotel's property interest in the Building. The City's Motion to Dismiss Hotel's Fifth Amendment claim as it relates to floors 2—9 is denied.

### iii.    Hotel's Interest in the Permit

The City does not contest in its reply brief Pittsfield's allegation that "the Permit which authorized [Pittsfield] to construct a hotel…was effectively revoked…." This revocation rendered the Permit useless, which is precisely what the Seventh Circuit instructs the Court to look for in analyses of complete deprivation of economically beneficial use. Hotel's claim that the effective revocation of the Permit constituted a regulatory taking survives the City's Motion.

## III.    Procedural Due Process Claims

"[P]rocedures due in zoning cases are minimal." *River Park v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994). "When zoning decisions are confided to a legislative rather than a judicial body…the affected persons have no right to notice and an opportunity for a hearing: no right, in other words, to procedural due process." *Indiana Land Co., LLC v. City of Greenwood*, 378 F.3d 705, 710 (7th Cir. 2004).

Here, Pittsfield had actual notice, "via a notice posted on a public light pole across from the Building," of both the Zoning Change itself and the meeting that would eventually codify the Zoning Change. Pittsfield does not even allege a failure to receive notice. Rather, the claim amounts to little more than mewling about the manner in which the notice was received. Even if Pittsfield had received no notice whatsoever, and even had Pittsfield alleged that it was denied an opportunity to be heard, *River Park* and *Indiana Land* establish difficult terrain for a procedural due process claim to proceed. But here, where actual notice was received, there is nothing in the Complaint suggesting the denial of a hearing, and "scant process is all that is due in zoning cases," *River Park*, 23 F.3d at 167, Pittsfield fails to suggest a federal procedural violation.

Briefly, Pittsfield suggests that because "there was never a proper quorum present" at the meeting where the Downzoning Ordinance was recommended for passage by the Committee on Zoning, Landmarks, and Buildings Standards, the "recommendation was not valid." "A complaint does not state a valid procedural due process objection…if it does not include a challenge to the fundamental fairness of the state procedures." *Hamlin v. Vaudenber*, 95 F.3d 580, 583 (7th Cir. 1996) (internal citation omitted). Pittsfield raises no such challenge, merely arguing that because the quorum was insufficient, so was the recommendation. Pittsfield does not even go so far as to say such a procedural misstep should invalidate the resulting ordinance. Moreover, Pittsfield offers no response to the City's arguments opposing Pittsfield's

quorum quibbles.  Absent something more contesting the fairness of the proceeding, Pittsfield's quarrel with the quorum is lacking in legal viability.  The procedural due process claims are dismissed.

## IV.    Equal Protection Claims

The City characterizes Pittsfield's equal protection claims as arising under a "class of one" theory, a characterization that Pittsfield does not contest.  The Seventh Circuit has "recognized equal protection claims brought by a 'class of one,' although [the court has] acknowledged that it is difficult to succeed with such a claim." *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).  To state a class of one claim under the Fourteenth Amendment, Pittsfield must allege that it "(1) has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus'" toward Pittsfield by the City.  *Maulding Development, LLC v. City of Springfield, Ill.*, 453 F.3d 967, 970 (7th Cir. 2006).

We need not address the second half of the class of one analysis, since Pittsfield fails to advance the first.  The only language that might be construed as attentive to the issue of whether Pittsfield was treated differently than others similarly

situated comes in the form of spot zoning allegations. Stated with slight variation at different points in the Complaint, Pittsfield essentially contends that because the Zoning Change concerned the Building alone, affecting no other surrounding properties, the Downzoning Ordinance is "unconstitutional spot zoning." This is inadequate to state a claim.

That "no other surrounding properties" were affected by the Downzoning Ordinance is an insufficient metric by which to allege disparate treatment from a similarly situated class, entity, or individual. *See Purze v. Village of Winthrop Harbor*, 286 F.3d 452, 455 (7th Cir. 2002) ("In order to succeed, the [plaintiffs] must demonstrate that they were treated differently than someone who is *prima facie* identical in all relevant respects"). The Complaint offers nothing to suggest that the surrounding properties are similar to the Building in character, function, occupancy, appearance, ownership, or any other surmisable trait. There is no discussion about the frequency or infrequency of targeted zoning ordinances in Chicago, nor anything concerning the intentionality of the legislation – i.e., whether the Downzoning Ordinance differs in the way it treats Pittsfield from the way other zoning regulations treat other property owners.

Pittsfield is not expected at the pleadings stage to provide unnecessary specifics about every aspect of the City's zoning policy and its effect on buildings throughout the downtown area. It is, however, required to provide the Court with allegations of fact adequate to raise an inference of liability on the City's behalf. A complaint

thoroughly devoid of language concerning similarly situated properties or property owners cannot be expected to raise this inference in an equal protection context. The City's Motion is granted as to Pittsfield's equal protection claims.[5]


## V.    Substantive Due Process Claims

As a threshold matter, "a plaintiff desiring to bring a substantive due process claim is required to show either the inadequacy of state law remedies or an independent constitutional violation." *Doherty v. City of Chicago*, 75 F.3d 318, 326 (7th Cir. 1996). Having recognized two of Pittsfield's takings claims as sufficient to survive the City's 12(b)(6) challenge, we find that Pittsfield has satisfied this initial burden.

Where a zoning ordinance interferes with an entity's property interest, "substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational." *Lee v. City of Chicago*, 330 F.3d 456, 467 (7th Cir. 2003). "A zoning decision denies substantive due process only if it is invidious or irrational." *Harding v. County of Door*, 870 F.2d 430, 431 (7th Cir. 1989).

---

[5] Pittsfield dedicates the majority of its response brief's discussion of the equal protection claims to the viability of its spot zoning allegations under state law. But Pittsfield pleads its Illinois spot zoning claim as a constitutional matter in Count VI, which it concedes in the same response brief as being improperly before the Court for want of recoverable damages under the Tort Immunity Act, 745 ILCS 10/2-103. Having already accepted Pittsfield's concession that Count VI is not properly before the Court, we will not now entertain a state law squabble subsumed in a count Pittsfield itself concedes should be dismissed.

Because of the factual nature of the rational basis test, any request for 12(b)(6) judgment on rational basis grounds will inherently present the Court with an uncomfortable dilemma.  The observations of the Seventh Circuit, however, help us sift through the mire:

> The rational basis standard requires the government to win if any set of facts reasonably may be conceived to justify its classification; the Rule 12(b)(6) standard requires the plaintiff to prevail if relief could be granted under any set of facts that could be proved consistent with the allegations.  The rational basis standard, of course, cannot defeat the plaintiff's benefit of the broad Rule 12(b)(6) standard.

*Wroblewski v. City of Washburn*, 965 F.2d 452, 459 (7th Cir. 1992) (internal citations omitted).  While the *Wroblewski* dictate flows from the equal protection context, its rationale plainly contemplates any application of rational basis review at the 12(b)(6) stage.  "The [12(b)(6)] standard is procedural, and simply allows the plaintiff to progress beyond the pleadings and obtain discovery, while the rational basis standard is the substantive burden that the plaintiff will ultimately have to meet to prevail…."  *Id*. at 459—60.  "If rational basis review 'is not a rubber stamp,' then there must be a role for actual fact-finding, and it must be possible for a plaintiff to prove facts to overcome the presumption of constitutionality."  Timothy Sandefur, *Rational Basis and the 12(b)(6) Motion: An Unnecessary 'Perplexity'*, 25 Geo. Mason U. Civ. Rits. L.J. 43, 60—61 (2014), (quoting *Hadix v. Johnson*, 230 F.3d 840, 843 (6th Cir. 2000)).

With *Wroblewski* in mind, the Court finds that it is ill-equipped at this juncture to dismiss a substantive due process claim based on hypothesized, unsubstantiated rational bases surmised entirely without the benefit of fact discovery. The Downzoning Ordinance affected but a single property, was passed in direct contravention of the City's previously issued Permit, and went into effect well after a significant portion of the Building had been demolished – all of which allegedly contributed to substantial pecuniary loss on Pittsfield's behalf. These allegations raise the reasonable inference that the Downzoning Ordinance was arbitrary in nature. At the pleadings stage, this is enough; the City will have ample opportunity in discovery to unearth facts suggesting otherwise. The Motion is denied as to Pittsfield's substantive due process claims.

## VI.    Promissory Estoppel Claim

Although Pittsfield concedes that its state law inverse condemnation claim and Illinois Constitution claims fail because the Local Governmental and Governmental Employees Tort Immunity Act ("Tort Immunity Act") bars recovery, it insists its promissory estoppel claim in Count V is not similarly barred. The Tort Immunity Act states, "A local public entity is not liable for an injury caused by adopting…an enactment…." 745 ILCS 10/2-103. Referring to Valenziano's May 1 letter, Pittsfield contends in its promissory estoppel count that it "suffered damages by changing [its] reliance upon the promises made to [it] by the City…." Notably, this language does

not specifically cite the Downzoning Ordinance as the actionable mechanism that induced Pittsfield's reliance.

However, "[t]aking the complaint as a whole," *Iqbal*, 556 U.S. at 698, it is obvious that any damages Pittsfield suffered subsequent to its reliance on promises allegedly made by the City were inflicted with the passage of the Downzoning Ordinance. The $70,000,000 judgment Pittsfield requests in Count V is the same as that requested in Counts III, IV, and VI. The latter counts all allege injury inflicted by the Downzoning Ordinance. Nowhere outside of Count V does Pittsfield enfetter Valenziano's letter to the injury it suffered. Rather, Pittsfield makes abundantly clear throughout the Complaint that it relied on the DX-16 classification in incurring substantial costs prior to the Zoning Change. These costs turned into damages with the passage of the Downzoning Ordinance – precisely the sort of injury from which recovery is barred under the Tort Immunity Act.

Pittsfield's shoehorning of a promissory estoppel claim into the Complaint does not by mere force of will shift the source of its injury from the Downzoning Ordinance to Valenziano's letter. To allow Pittsfield to circumvent the Tort Immunity Act by tethering injuries to an alleged promise that did not, in fact, cause any damages would amount to a contravention of the legislation itself. The Court declines to shepherd forward a count that not only flouts unambiguous state law, but also plainly contradicts the allegations of the rest of the Complaint. Any damages flowing from a promissory estoppel claim arise solely because of injuries incurred pursuant to the

Zoning Change. The Tort Immunity Act bars recovery for damages of just this sort. Count V is dismissed accordingly.

## CONCLUSION

For the reasons above, the City's Motion is granted in part and denied in part. Counts IV, V, and VI are dismissed, as are the procedural due process and equal protection components of Counts I, II, and III. Residential's and Development's takings claims as pleaded in Counts I, II, and III are also dismissed. The City's Motion is denied, however, with respect to the takings claims attached to Hotel's interest in floors 2—9 and Hotel's interest in the Permit, as articulated in Pittsfield's first three counts. Counts I, II, and III's substantive due process claims survive the Motion, as well. It is so ordered.

Dated: 11/28/2017

Charles P. Kocoras
United States District Judge