# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

PITTSFIELD DEVELOPMENT,                        )
LLC, an Illinois limited liability company,    )
PITTSFIELD RESIDENTIAL, II, LLC,               )
an Illinois limited liability company, and     )
PITTSFIELD HOTEL HOLDING, LLC,                 )
an Illinois limited liability company          )
                                               )
        Plaintiffs,       )
                                               )
                                               )      17 C 1951
    v.                           )
                                               )
CITY OF CHICAGO,                               )
                                               )
        Defendant.        )
                                               )
                                               )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant City of Chicago's ("City") motion to dismiss Plaintiffs Pittsfield Development, LLC, ("Development") Pittsfield Residential Hall, LLC, ("Residential") and Pittsfield Hotel Holdings, LLC's ("Hotel") (collectively, "Pittsfield") amended complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and motion for partial reconsideration of this Court's November 28, 2019 Order ("November Order"). For the following reasons, the City's motion to dismiss is denied. The City's motion for partial reconsideration is also denied.

# BACKGROUND

The Court accepts as true the following well-plead allegations from Pittsfield's Complaint and attached exhibits. All possible inferences are drawn in Pittsfield's favor. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

On or about July 12, 2000, Development purchased the forty-story Pittsfield Building ("Building") located in downtown Chicago, Illinois. The Building has since been divided into four separate subdivisions. Development owns and operates the ground floor, all basement and sub-basement levels, floors 23–40 ("Tower"), as well as portions of floor 22. Hotel, organized for the purpose of constructing and operating a hotel in the Building, owns floors 2-9. Residential owns floors 10-12. Development, Hotel, and Residential are all related entities. Floors 13-21 are owned and operated by 55 E. Washington Development, LLC, a third party, and is primarily used for student housing.

At the time of purchase in 2000, the Building was zoned DX-16 Downtown Mixed Use District ("DX-16"). DX-16 allowed for various uses within the Building, including the build-out, ownership, and operations of a hotel and twenty-seven additional residential units. Pittsfield intended to establish a hotel on floors 2-9 and develop "spectacular city residential dwelling units" on the Tower floors.

On April 2, 2014, Dennis Kulak ("Kulak")[1] sent a letter to the City's zoning administrator. Kulak's letter included a $150.00 review fee and a request seeking a "written opinion that a Boutique hotel with two hundred and ten rooms would conform to the City of Chicago Municipal Zoning Ordinance." On May 1, 2014, Steven Valenziano ("Valenziano"), the City's Assistant Zoning Administrator, sent Pittsfield a letter indicating that "a 210-room hotel with associated hotel operations … is a permitted use in the DX-16 district and therefore would be allowed to establish by-right at the subject site."

Pittsfield, relying upon the DX-16 zoning classification and Valenziano's letter, arranged to empty the Building of all tenants save those on floors 10-12 and certain retail tenants on the ground floor. Pittsfield then completely demolished floors 7-9 in anticipation of hotel construction on floors 2-9. As a result, Pittsfield gave up the opportunity to earn regular income from office tenants who could no longer rent space after the demolition. Pittsfield also expended professional fees and costs "in excess of hundreds and thousands of dollars" to prepare a construction permit application. On or about December 10, 2015, the City issued a building permit (the "Permit") to Hotel to construct a hotel with up to 191 units on floors 2-9 of the Building.

On or about August 3, 2015 – four months before the issuance of the Permit – Pittsfield entered into a contract to sell all of its property interests in the Building to

---

[1] Kulak was an individual who represented Pittsfield in some unclear fiduciary capacity.

Adam David Partners, I, LLC ("Prospective Buyer") for $36 million. Although the parties ultimately failed to close on the sales contract, at some point, a representative for the Prospective Buyer met with Alderman Brendan Reilly to express the Prospective Buyer's interest in converting the entire building into residential units.[2] Shortly thereafter, Alderman Reilly publicly voiced his opposition to the operation of a hotel in the Building.

On February 10, 2016, two months after Hotel received the Permit and well after the demolition of floors 7-9, Alderman Reilly introduced an ordinance to the City of Chicago Council to change the zoning of the Building ("Zoning Change") from DX-16 Downtown Mixed Use to DR-10 Downtown Residential Use ("DR-10"). Pittsfield was made aware of the proposed Zoning Change via a notice posted on a public light pole across from the building.

On or about March 16, 2016, Ordinance O2016-811 of the City of Chicago ("Downzoning Ordinance") approved the Zoning Change. The Downzoning Ordinance affected only the Building and changed its zoning classification from DX-16 to DR-10. Pittsfield contends that DR-10 zoning allowed for significantly fewer residential units in the Building than already existed, essentially barring construction of new units in the Tower. Additionally, DR-10 zoning prohibited the Building from being used as a hotel, effectively revoking the Permit and requiring most of Pittsfield's property interests in

---

[2] Whether the Prospective Buyer's discussion with Alderman Reilly occurred before or after the Pittsfield deal fell through is unclear on the face of the Complaint.

the Building to sit empty. Floors 10-12 and certain retail space on the ground floor were unaffected.

Almost a full year after the Downzoning Ordinance was passed, Pittsfield engaged a broker to sell its interests in the Building at an auction held on February 28, 2017 and March 1, 2017. Pittsfield alleges that several buyers were willing and able to make a purchase, and would have otherwise submitted offers, but were uninterested in the Building because the Downzoning Ordinance restricted the property's use. Pittsfield was unable to sell the property at the auction.

On March 26, 2017, Development filed for Chapter 11 bankruptcy (Case No. 17-9513 in the United States Bankruptcy Court for the Northern District of Illinois).[3] Pittsfield claims that solvency was necessary because the property was unable to generate any income. On or about May 23, 2017, Pittsfield moved for an order allowing it to sell the Building in a court-ordered auction. The bankruptcy court granted Pittsfield's motion and on or about June 13, 2017, the bankruptcy court entered an order approving Ten-X, LLC ("Ten-X") to auction off the property at a liquidation sale.

On June 29, 2017, the property collectively sold for $20,800,000, and the sale closed on August 26, 2017. Pittsfield alleges that only Residential operated at a profit and generated any meaningful income.

---

[3] On March 13, 2017, Pittsfield filed its initial complaint and on December 28, 2017, this Court dismissed various claims and permitted others to survive. Following the Court's ruling, Pittsfield advised the Court that it sold their real property in the Building. The City moved, and we granted, an order directing Pittsfield to amend their pleadings to conform with the Court's Opinion and to include the new facts pertaining to the sale.

On January 16, 2018, Pittsfield filed its five-count amended complaint. In Count I, Pittsfield alleges a regulatory taking claim under the Fifth Amendment, stemming from the City's regulatory taking of its property interest in floors 2-9. Count II also raises the same challenge but alleges a regulatory taking of the building permit itself. Counts III-V allege substantive due process violations pertaining to the effective revocation of the Permit, Development's interest in the Tower, and Residential's interest in floors 10-12.

## LEGAL STANDARD

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) "tests the sufficiency of the complaint, not the merits of the case." *McReynolds v. Merrill Lynch & Co.*, 694 F.3d 873, 878 (7th Cir. 2012). The allegations in a complaint must set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A plaintiff need not provide detailed factual allegations, but must provide enough factual support to raise his right to relief above a speculative level. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

A claim must be facially plausible, meaning that the pleadings must "allow…the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The claim must be described "in sufficient detail to give the defendant 'fair notice of what the…claim is and the grounds upon which it rests.'" *E.E.O.C. v. Concentra Health Servs., Inc.*, 496 F.3d 773, 776 (7th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). "[D]ocuments attached to a

motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim," and may be considered in a district court's ruling on a motion to dismiss. *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand a 12(b)(6) motion to dismiss. *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. City's Motion to Reconsider

Preliminarily, the Court addresses the City's motion for partial reconsideration of our November Order. In its motion, the City argues that the Court's ruling constituted "clear error of law," contending: (1) recognition of a property interest in a permit itself goes against Supreme Court precedent; (2) Illinois law creates no property interest in Hotel's building permit; and (3) even if the Illinois' vested rights doctrine creates a property right interest in Hotel's building permit, the vested rights doctrine does not implicate the Takings Clause.

At its core, the City's motion centers around its third point. However, because the City's third point is strongly correlated with its first and second point, we find a deeper probing of the first two issues are also appropriate.

Motions to reconsider "serve a limited function: to correct manifest errors of law or fact or to present newly discovered evidence." *Caisse Nationale de Credit Agricole v. CBI Indus., Inc.,* 90 F.3d 1264, 1269 (7th Cir. 1996). While a motion to reconsider

falls squarely within the Court's discretion, *id.* at 1270, such motions are generally disfavored and should be granted only in rare circumstances. *Patrick v. City of Chicago*, 103 F. Supp. 3d 907, 911 (N.D. Ill. 2015); *Caine v. Burge*, 897 F. Supp. 2d 714, 717 (N.D. Ill. 2012). Once judgment has been entered, a party seeking reconsideration bears a heavy burden to show that there is good reason to set it aside. *Hecker v. Deere & Co.*, 556 F.3d 575, 591 (7th Cir. 2009). Motions to reconsider are not appropriate vehicles for relitigating arguments that were previously rejected or for arguing issues that could have been raised during the pendency of the motion under reconsideration. *Caine*, 897 F. Supp. 2d at 718.

### A.     Recognition of a Property Right Interest in a Permit Itself Does Not Go Against Supreme Court Precedent

We first evaluate whether the vested rights doctrine under Illinois law can constitute a Takings claim for a building permit. A takings claim's premise depends in large part upon the landowner's "expectations," and whether such expectations can be constitutionally justified to constitute "property." *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104 (1978). Whether a regulatory taking has occurred depends on three factors: (1) the economic impact of regulation, (2) "reasonable" investment-backed expectations, and (3) the "character" of the government action. *Penn Central*, 438 U.S. at 124. "The economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations are … relevant considerations." *Id.* at 124.

Landowners' expectations are enhanced if they are "investment-backed." *Id.*; *See Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 494, 95 (1987) (recognizing that investment-backed expectations are a factor to consider when examining the "taking" question). While older cases within the Supreme Court's jurisprudence flatly denied compensation of property values, *Pennsylvania Coal Company v. Mahon* recognized a taking "if regulation goes too far." 260 U.S. 393, 415 (1922).

Despite an expansion of governmental regulations over the years, the Supreme Court has failed to establish "a set formula [in determining] where regulation ends and taking begins." *Penn Central*, 438 U.S. at 124. Indeed, "[t]his area of law has been characterized by 'ad hoc, factual inquiries, designed to allow careful examinations and weighing of all the relevant considerations.'" *Id.* (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002)).

The Seventh Circuit has yet to address the head-on question of whether the holder of a building permit has a Fifth Amendment property right interest in the permit itself. *See CEnergy-Glenmore Wind Farm No. 1, LLC v. Town of Glenmore*, 769 F.3d 485, 486 (7th Cir. 2014) (declining to decide whether CEnergy maintained an identifiable property interest in the permit itself). With no case directly on point, we relied on *Scott v. Greenville Cty.*, 716 F.2d 1409, 1412 (4th Cir. 1983), which portended the very situation Pittsfield finds itself in.

The City takes exception however, claiming that *Scott's* contemplation of a building permit obtaining vested right interests under the takings clause goes against precedent set forth in *Wheeler v. City of Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. Unit B 1981) and *Maher v. City of New Orleans*, 516 F.2d 1051, 1065 (5th Cir. 1975).

The Court's assertion does not constitute clear error of law. A deeper analysis of *Maher* and *Wheeler* illustrates the unique position Pittsfield finds itself in. The City correctly asserts that in *Maher*, the effect of precluding the issuance of a permit "does not alone make out a case of taking" and "[a]s the ordinance was applied to [the plaintiff], the denial of the permit to demolish and rebuild does not operate as a classic example of eminent domain, namely a taking of [the plaintiff's] property for government use." *Maher*, 516 F.2d at 1066. However, the City overlooks a critical distinction. In *Maher*, the plaintiff's permit was subsequently rescinded and litigation commenced upon city council's final refusal to re-issue the permit. Here, Pittsfield relied on a valid permit that was never formally rescinded throughout the entire course of its litigation.

Pittsfield's situation is also distinct from *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 593 (1962). The City correctly points out that municipalities validly exercise their police power when the government infringes on a property owner's use of property. *Goldblatt*, 369 U.S. at 593. However, in *Goldblatt*, no evidence was

proffered to prove that the ordinance would reduce the value of the lot. Here, Pittsfield alleges that its property lost all its value as a result of the Permit being confiscated.[4]

At its core, the interest Pittsfield argues for derives from a concept that a landowner should be free from retroactive application of a land use regulation, which, contrarily, the City correctly argues is prima facie valid exercises of the State's police powers. These conflicting theories were contemplated by Justice Scalia in *Lucas v. South Caroline Coastal Council*, 112 U.S. 2886, 2894 n.7 (1992), when he stated that additional guidelines may be needed for courts to adequately resolve this issue. With no clear answer derived from federal law, our attention turns to applicable Illinois state law.

### B. The Building Permit Is A Property Right Interest Under Illinois Law

The Permit fits squarely within the Illinois' vested rights doctrine. A permit must be issued once a developer meets the criteria imposed by a governmental unit.[5] *General Baking Co. v. Board of Street Comm'rs*, 242 Mass. 194, 196-98 (1922) (a builder may claim protection once he has complied with the permit requirements). While a permit is revocable by subsequent legislation, Illinois inflects this rule by evaluating the owner's reliance on the permit. *See Pioneer Trust & Sav. Bank v. County of Cook*, 377 N.E.2d 21, 26 (Ill. 1978) ("[W]here there has been a substantial change of position,

---

[4] For purposes of this 12(b)(6) motion, this Court must accept true Pittsfield's claim that the Pittsfield Building lost all of its property value as a result of the Permit being confiscated.

[5] A validly issued building permit affirms that substantive and procedural safeguards designed to protect the public welfare have been accounted for. I. R. POWELL, THE LAW OF REAL PROPERTY, 91-135 (1977).

expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right …).

In our November Order, we determined that the Permit acquired "vested property rights" under the "Illinois property right doctrine." Illinois precedent reveals that its "vested property right" doctrine is narrow in scope. *Image Media Advert., Inc. v. City of Chic.*, WL 6059921, at *5 (N.D. Ill. 2017). This doctrine states:

> [W]here there has been a substantial change of position, expenditures or incurrence of obligations made in good faith by an innocent party under a building permit or in reliance upon the probability of its issuance, such party has a vested property right and he may complete the construction and use of the premises for the purposes originally authorized, irrespective of subsequent zoning or a chance in zoning classification.

*Sgro v. Howarth*, 203 N.E.2d 173, 177 (Ill. App. 1964)

Indeed, the doctrine makes clear that for estoppel to apply, there must be a reasonable reliance that a building permit would issue. *Vaughn v. Speaker*, 126 Ill. 2d 150, 162-163 (1988); *see Lucas v. Village of La Grange*, 831 F. Supp. 1407, 1413 (N.D. Ill. 1993) (finding a party has a "vested property right" under Illinois law if the party relied on the probable issuance of a building permit in good faith). Taking it a step further, "Illinois is one of the few states which recognizes that actual expenses incurred before a permit is ever granted may provide the basis for a claim to vested rights." *First Nat. Bank & Trust Co. v. City of Rockford*, 47 Ill.App.3d 131, 145 (1977). "The vesting of the right presupposes a legal building permit and a substantial change of position

incurred in good faith reliance thereon by the property owner." *Ganley v. City of Chicago*, 18 Ill.App.3d 248, 254 (1974).

Pittsfield sufficiently pled facts affording property right interests to the Permit. Pittsfield has alleged that it was issued a valid permit. As discussed at great lengths in the November Order, the Court need not question whether Pittsfield's demolition of three whole floors anticipated some presupposed permit, because an actual permit, *the* Permit, was issued after both extensive demolition and the spending of hundreds of thousands of dollars on the Permit application.

As it appears that Illinois law recognizes the vesting of an actionable right in a permit that issued on the heels of considerable expenditure and construction, the Permit acquired vested property rights under the Illinois property right doctrine. Accordingly, finding no clear error of law, we next evaluate whether Pittsfield has asserted the kind of property interest compensable under the Takings Clause.

**C.     Whether The Permit Gives Rise To a Property Interest Compensable As a Taking**

The last hurdle we must evaluate is whether the Illinois vested rights doctrine contemplates a compensable taking under the Fifth Amendment takings clause. Whether Pittsfield has a constitutionally protected private property interest under the Takings Clause turns on "existing rules or understandings that stem from an independent source such as state law." *Daniels v. Area Plan Comm'n of Allen Cnty.*, 306 F.3d 445, 459 (7th Cir. 2002). This analytical framework is derived from *Pro-Eco,*

*Inc. v. Board of Com'rs of Jay County, Ind.*, 57 F.3d 505, 513 (7th Cir. 1995)  (*Pro-Eco II*).

In *Pro-Eco II*, the plaintiff developer held an option contract to buy a plot of land in which it intended to build a landfill.  *Id.* at 509.  One of the questions presented to the court was whether the option contract was "property in itself for which the owner must be compensated if its value is destroyed by a zoning regulation that goes too far." *Id.*  Analogizing to a Supreme Court case derived from California, *see Nollan v. California Coastal Comm'n*, 438 U.S. 825 (1987), the court turned to state law to determine the option contract's protections under the Fifth Amendment.  On similar facts to those of *Pro-Eco II*, the *Nollan* Court found an actionable takings claim, while the Seventh Circuit in *Pro-Eco II* did not.  The reason for the divergent decision fell upon a simple premise: "California recognizes a compensable property right in unexercised options to purchase real estate.  Indiana, apparently, does not."  *Pro-Eco, Inc.*, 57 F.3d at 509 (internal citations omitted).

Taking our cue from *Pro-Eco II*, we must determine whether Illinois law, particularly the Illinois vested rights doctrine, recognizes a compensable taking under the Fifth Amendment.  The City argues that even if Pittsfield acquired a "vested property right" in the Permit, that right does not give rise to a property interest compensable as a taking under Illinois law.  Pittsfield responds that the Permit's status as a vested right is so complete and unconditional that it may be equated with a property interest.

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation." U.S. Const., Amdt. 5. The takings clause is intended to compensate with money an individual whose property rights are impacted by government action. *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 535 U.S. 302, 322 (2002).

At its core, the Court must determine whether the Permit is an interest that warrants its own substantive Takings analysis. The City says no, arguing that the Illinois vested rights doctrine does not offer compensable relief and and is premised on an individual's ability to retain a "writ of mandamus," allowing the injured party to "complete the construction and use of the premises for the purposes originally authorized." *Fifteen Fifty North State Bldg. Corp. v. City of Chicago*, 155 N.E. 2d 97, 37 (Ill. 1958). To support this contention, the City directs the Court's attention to *Image Media Advertising, Inc. v. City of Chicago, et al.*, 2017 WL 6059921 (N.D. Ill. 2017), which explains that every Illinois "vested property" case identifies a "writ of mandamus" as the proper form of equitable relief. *See Pioneer Trust & Sav. Bank v. Cook Cnty*, 377 N.E.2d 21, 22 (Ill. 1978). Pittsfield argues that a substantive Takings analysis is warranted because the Permit is a vested right so complete and unconditional that it may be equated with a property interest. *See Bell v. City of Country Club Hills*, 841 F.3d 713 (7th Cir. 2016). We agree with Pittsfield.

"Remedies are the life of rights, and are equally protected by the constitution. Deprivation of a remedy is equivalent to a deprivation of a right which it is intended to vindicate, unless another remedy exists, or is substituted for that which is taken away." *Bd. of Educ. of Normal Sch. Dist. v. Blodgett*, 155 Ill. 40 N.E. 1025, 1027 (1985). "Whether acting through its judiciary or through its Legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." *Hogan*, 29 Ill. 2d at 187-88.

We agree with Pittsfield that it had no real opportunity to protect its rights because applying for a writ of mandamus was not a viable option after the Downzoning Ordinance. Pittsfield has plausibly alleged that reputable hotel brands and operators could not be reasonably expected to proceed with such a development given the hostile political environment. The Downzoning Ordinance and lack of subsequent funding for Hotel's development ultimate forced the bankruptcy of the Pittsfield building and disposition of the Properties at a liquidation sale. Pittsfield's assertions are especially plausible because the Downzoning Ordinance was not enacted until after Alderman Reilly publicly voiced his opposition to the operation of a hotel in the Building, which curiously happened two months after the issuance of the Permit.

Given the circumstance, we also find that in this instance that the vested right doctrine is a procedural statute and not a remedial or substantive one. Pittsfield has alleged that the valid Permit was issued, demolition had already begun, significant costs

were incurred, and the Downzoning Ordinance effectively revoked Hotel's permission to build. The Court is not aware of, and the City does not illustrate, any Illinois case addressing the vesting of a property right in an already-issued permit where takings considerations are at stake. This includes the Illinois vested rights doctrine. Therefore, because Illinois law has not contemplated such a scenario, Pittsfield remedial rights are not limited to what is ascertainable within the vested rights doctrine. Accordingly, Pittsfield has demonstrated that it has a constitutionally protected property right interest under the Takings Clause.

Having determined that the Permit is a constitutionally protected property right interest under the Takings Clause, we direct our attention to the City's motion to dismiss.

## II.     City's Motion To Dismiss

### A.     Fifth Amendment Takings Claims

In Counts I and II of the amended complaint, Pittsfield alleges a confiscatory taking of its property interest in floors 2-9 and of the Permit.

The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, provides that private property shall not "be taken for public use, without just compensation." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 536, 125 S. Ct. 2074, 2080, 161 L. Ed. 2d 876 (2005) (internal citations omitted). The Takings Clause "does not prohibit the taking of private property, but instead places

a condition on the exercise of that power." *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles*, 482 U.S. 304, 314 (1987).

To establish a claim under the Takings Clause, a plaintiff "must identify a property interest protected by the Fifth Amendment … and prove that the state has effected a taking of that property." *Wield v. Raemisch*, 296 F. App'x 535 (7th Cir. 2008) (internal citations omitted). Ordinarily, a plaintiff "cannot claim that the Takings Clause has been violated until after he has sought compensation from the state, though immediate relief may be available in federal court if the plaintiff is making a facial challenge to a state regulation or legislative action authorizing a taking." *Id.* (internal citations omitted).

Of the four categories of regulatory action that "generally will be deemed *per se* takings for Fifth Amendment purposes," the parties solely address whether the City's Downzoning Ordinance "completely deprive[d] [Pittsfield] of 'all economically beneficial use'" of its property. *Lingle*, 544 U.S. at 536.

A party alleging complete deprivation of all economically beneficial use of a property must clear an exceptionally high hurdle. "[I]n at least *some* cases the landowner with 95% loss will get nothing, while the landowner with total loss will recover in full …. Takings law is full of these 'all-or-nothing situations.'" *Lucas*, 505 U.S. at 1019 n.8. In both *Murr v. Wisconsin*, 137 S. Ct. 1933, 1949 (2017) and *Palazzolo v. Rhode Island*, 533 U.S. 606, 631 (2001), the Supreme Court declined to find complete deprivations of economically beneficial use where the landowners at

issue retained permission to build residences on their property. In both cases, neither property was resigned to sit "economically idle." *Lucas*, 505 U.S. at 1019. "In order to qualify as a regulatory taking, the measure must place such onerous restrictions on land as to render it useless." *Muscarello v. Ogle County Bd. of Com'rs*, 610 F.3d 416, 421 (7th Cir. 2010).

### i. Count I

#### a. Pittsfield's Interest in Floors 2-9

Count I alleges a regulatory taking of Pittsfield's building because the Downzoning Ordinance served to deny allowance of any economically viable uses for the Hotel Property. The City puts forth various arguments in its motion to dismiss, but perhaps the most significant one is its reliance on existing court filings pertaining to Pittsfield's bankruptcy sale of its interests in the building. The City claims that the Downzoning Ordinance did not render Hotel's floors valueless because court filings from the bankruptcy sale establishes that at least 60 percent of the value of the purchase offers Pittsfield received "was allocable" to floors 2-9.

Pittsfield alleges that only the Residential Property – floors 10-12 – of the Building was generating income. Therefore, Pittsfield claims that the Hotel Property had no independent value, and while all three properties sold as a single block generated bid, "nobody would have even bid on [floors 2-9] alone." Pittsfield argues that for purposes of this motion, the City has no basis to dispute this issue.

In essence, the parties' discussion hinges on whether at this stage of the pleadings we may take judicial notice of the bankruptcy sale, and to what exacting detail we may consider it.

The Court's review on a 12(b)(6) motion is typically limited to the pleadings in the Complaint and any attachments. *Limestone Dev. Corp. v. Vill. of Lemont*, 473 F. Supp. 2d 858, 867 (N.D. Ill. 2007). The Court may, however, take judicial notice of "facts that are (1) not subject to reasonable dispute and (2) either generally known within the territorial jurisdiction or capable of accurate and ready determination through sources whose accuracy cannot be questioned." *Ennenga v. Starns*, 677 F.3d 766, 773–774 (7th Cir. 2012).

At this point in the proceeding, we find that the Hotel Property's value is subject to a reasonable dispute. We find that it is much better to permit discovery to address material facts and all the surrounding facts and circumstances bearing at them.

\*　　\*　　\*

Pittsfield further contends it also alleges a *Penn Central* claim. When a regulation impedes the use of property without depriving the owner of all economically beneficial use, "a taking still may be found based on a 'complex of factors,' including (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectation; and (3) the character of the governmental action." *Murr v. Wisconsin*, 137 U.S. 1933, 1943 (2017).

Given the breadth of the Plaintiffs' claims in the amended complaint and its alleged reliance on the City's actions prior to its downzoning action, particularly as regards to the substantial investment in pursuing its plans to reinvigorate the building, we believe it is appropriate to reconsider the application of a Penn Central claim in the face of the unique facts alleged. For these reasons, the jurisprudence set forth in the Penn Central opinion shall be fully considered by this Court as the facts develop.

### ii. Count II

#### a. The Permit

In Count II, Pittsfield alleges a confiscatory taking of the Permit itself. The City argues that the sale of the Pittsfield Building renders Counts II moot because Pittsfield is no longer able to request a writ of mandamus. Pittsfield alleges that its claim is not moot because the writ of mandamus was not a viable option after the enactment of the Downzoning Ordinance. We agree.

"The doctrine of mootness stems from Article III of the Constitution, which limits the jurisdiction of federal courts to live cases or controversies." *Damasco v. Clearwire Corp.*, 662 F.3d 891, 894 (7th Cir. 2011). The mootness doctrine requires that parties possess "a personal stake in the outcome at all stages of the litigation." *Id.* at 895. "A case becomes moot, and the federal courts lose subject matter jurisdiction, when a justiciable controversy ceases to exist between the parties." *Aslin v. Financial Indus. Regulatory Auth., Inc.*, 704 F.3d 475, 477 (7th Cir. 2013). Simply put, "[f]ederal

courts lack subject matter jurisdiction when a case becomes moot." *Pakovich v. Verizon LTD Plan*, 653 F.3d 488, 492 (7th Cir. 2011).

We find that Count II is not moot because as thoroughly explained, the Permit is an interest that warrants its own substantive Takings analysis and that Pittsfield has plausibly alleged both a *Lucas* and *Penn Central* claim. We are unpersuaded by the City's argument that Pittsfield's claim is moot because as previously explained, seeking a writ of mandamus was not a viable option for Pittsfield after the enactment of the Downzoning Ordinance.

Therefore, Count II is not dismissed as moot.

### B.  Substantive Due Process Claims

In Counts III through V, Pittsfield asserts substantive due process violations alleging that the Ordinance arbitrarily interfered with their property interests in the Pittsfield Building.

The Seventh Circuit has recognized the potential for a substantial due process claim "in the content of land-use decisions that are arbitrary and unreasonable, bearing no substantial relationship to the public health, safety or welfare." *Doherty v. City of Chicago*, 75 F.3d 318, 325 (7th Cir. 1996), *amended* (March 28, 1996). However, "[f]ederal courts are not boards of zoning appeals," and a "disciplined jurisprudence in this area is required." *Id.* (internal citations omitted). Therefore, "in addition to alleging that the decision was arbitrary and irrational, 'the plaintiff must also show

either a separate constitutional violation or the inadequacy of state law remedies.'" *Id.* (quoting *Polenz v. Parrott*, 883 F.2d 551, 558 (7th Cir. 1989)).

"Some circuits have indicated that cases of political bias in land-use decision making may give rise, at least under some circumstances, to a substantive due process claim despite the seeming adequacy of state remedies." *Id.; See Brady v. Town of Colchester*, 863 F.2d 205, 215-16 (2d Cir. 1988). Others have indicated "that cases of political bias ought to be resolved under the First Amendment rather than under a substantive due process approach." *Id.; See Nestor Colon Medina & Sucesores v. Custodio*, 964 F.2d 32, 46-47 (1st Cir. 1992). However, Seventh Circuit precedent is clear, stating that "a plaintiff desiring to bring a substantive due process claim is required to show either the inadequacy of state law remedies or an independent constitutional violation." *Id.*

### i.    Count III

Count III alleges a substantive due process claim in the revocation of the Permit. The City argues that Pittsfield has failed to sufficiently allege such a claim because no constitutional violation occurred, and Pittsfield had a sufficient state remedy in the form of a writ of mandamus. Pittsfield alleges that it has a constitutionally protected interest in the Permit and state law fails to provide an adequate remedy.

Pittsfield has successfully alleged a substantive due process claim in the Permit itself because the Permit is an interest that warrants its own substantive Takings

analysis. Also, Pittsfield correctly points out that it did not have a viable state remedy because a writ of mandamus was not a viable option.

Therefore, Pittsfield has sufficiently alleged a substantive due process claim pertaining to the Permit.

### ii. Counts IV and V

Counts IV and V allege substantial due process violations pertaining to Development and Residential. With regards to these Counts, the Court refers to its November Order when discussing the inherent uncomfortable dilemma facing us because of the factual nature of the rational basis test. Therefore, as previously detailed in the November Order, the Court finds that it is ill-equipped at this juncture to dismiss these substantive due process claims based on rational bases surmised entirely without the benefit of fact discovery.

The Downzoning Ordinance affected but a single property, was passed in direct contravention of the City's previously issued Permit, and went into effect well after a significant portion of the Building had been demolished – all of which allegedly contributed to substantial pecuniary loss on Pittsfield's behalf. These allegations raise the reasonable inference that the Downzoning Ordinance was arbitrary in nature. At the pleadings stage, this is enough; the City will have ample opportunity in discovery to unearth facts suggesting otherwise. The motion is denied as to Pittsfield's substantive due process claims in Counts IV and V.

## **CONCLUSION**

For the reasons stated above, the City's motion to reconsider is denied. The City's 12(b)(6) motion is denied. It is so ordered.

Dated: 3/12/2019

Charles P. Kocoras
United States District Judge