## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PITTSFIELD DEVELOPMENT, LLC,     )
et al.,     )
    )
           Plaintiffs,     )
    )
           v.     )     17 C 1951
    )
CITY OF CHICAGO,     )
    )
           Defendant.     )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiffs Pittsfield Development, LLC ("Development"), Pittsfield Residential II, LLC ("Residential"), and Pittsfield Hotel Holdings, LLC ("Hotel") (collectively, "Pittsfield") brought this case alleging unconstitutional takings of property interests and substantive due process violations by Defendant City of Chicago ("City"). Before the Court is Pittsfield's motion for partial summary judgment and the City's motion for summary judgment. For the following reasons, Pittsfield's motion is granted-in-part and denied-in-part, and the City's motion is granted-in-part and denied-in-part.

## BACKGROUND

Pittsfield filed its complaint on March 13, 2017. Dkt. # 1. The Court issued an order granting-in-part and denying-in-part the City's motion to dismiss on November 28, 2017 ("November 2017 Order"). Dkt. # 20. Pittsfield filed a five-count amended

complaint on January 16, 2018, alleging regulatory taking claims under the Fifth Amendment stemming from the City's taking of Hotel's property interest in floors 2–9 of the Pittsfield Building ("Hotel Property") (Count I) and in the permit to build a hotel thereon ("Permit") (Count II). Dkt. # 29. Counts III–V allege substantive due process violations pertaining to the effective revocation of the Permit, Development's interest in floors 23–40 (the "Tower") and portions of floor 22 (together, "Development Property"), and Residential's interest in floor's 10–12 ("Residential Property"), respectively. *Id*. On March 12, 2019, the Court denied the City's motion to dismiss the amended complaint as well as its motion for partial reconsideration of the November 2017 Order ("March 2019 Order"). Dkt. # 54. On August 28, 2019, the Court also denied the City's motion for judgment on the pleadings seeking dismissal of the amended complaint ("August 2019 Order"). Dkt. # 74.

Pittsfield filed its motion for partial summary judgment on June 15, 2022, seeking judgment in its favor on Counts I and II, i.e., that there were uncompensated takings of the Hotel Property and the Permit, respectively. Dkt. # 170. On July 1, 2022, the City filed a motion to exclude the expert appraisal report and opinions of Pittsfield's expert, Stacy Nadolny, Dkt. # 174, and a motion seeking summary judgment on all five counts of the amended complaint, Dkt. # 177. On September 29, 2023, we granted-in-part and denied-in-part the motion to exclude. Dkt. # 223. We now address both Pittsfield's and the City's motions for summary judgment.

In resolving a motion for summary judgment, the Court views the evidence in

2

the light most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The following facts are taken from the record and are undisputed unless otherwise noted.[1]

The Pittsfield Building (the "Building") is a historic building located at 55 East Washington Street, Chicago, IL 60602 in downtown Chicago. In 2002, the Chicago City Council enacted an ordinance designating the Building as a Chicago Landmark. The landmark ordinance described the Building as one of Chicago's most handsome examples of a 1920s-era skyscraper, combining a distinctive, copper-clad, pyramidal-topped tower with decorate terra cotta cladding and bronze ornamentation that utilizes both Gothic and Art Deco-style motifs.

The Building is 40 stories tall and was purchased as an investment by Development on July 12, 2000, for $15,000,000. It has since been divided into four separately deeded vertical subdivisions, three of which were owned by Pittsfield. Pittsfield's properties were identified under PIN 17-10-312-019.

Development is an Illinois LLC that owned and operated most of the ground floor and all basement and sub-basement levels of the Building, along with the upper portion of the Building, consisting of the Development Property. Development was organized as an investment vehicle for its equity security holder to acquire, hold, and earn a return on investment in the Building. Residential is an Illinois LLC that owned

---

[1] Any asserted facts, or purported disputes of fact, that were immaterial or not supported by admissible evidence have not been included.

the Residential Property. Hotel is an Illinois LLC that owned the Hotel Property. The Development Property, Residential Property, and Hotel Property shall herein be referred to as the "Pittsfield Properties."

Development, Residential, and Hotel are related entities. They have had overlapping, but not identical, ownership, management, and control. Chicago Hotel Partners ("CHP"), owned by Brian Scheinblum, was a member of Hotel but not of Residential or Development. Scheinblum exercised management and control over Hotel but not over Residential or Development. Development was initially owned by a group of about ten investors and later owned by Robert Danial, Michael Sabet, and three members of Sabet's family, but these members were not the same for Hotel.

Beginning in 2004, the Building was zoned DX-16 Downtown Mixed Use District ("DX-16"). At all times relevant herein, DX-16 zoning allowed for a mix of uses, including retail, office, residential, and hotel, as a matter of right. DX-16 is the highest designation (providing for a higher number of uses and greater residential density than lower DX designations, such as DX-3) for a DX district which promotes vertical mixed use projects that contain active ground floor uses, with no minimum frontage requirements, no front set-backs, no side set-backs, an exemption from rear set-back standards, and no building height limits.

On December 28, 2007, Development conveyed floors 13–21 of the Building to 55 East Washington Development, LLC, an unrelated third party. On October 27, 2009, Development conveyed floors 9–12 of the Building to Residential.

4

The Building experienced a number of issues and received many building code violations. Pittsfield's architect, Dennis Kulak, appeared in court many times related to the Building's code violations. He testified that the Building had the most building code violations that he had ever seen. There was often debris on the 6th floor of the Building, which had a roof in a courtyard, that came from the middle floors of the Building because people would throw things out the window, such as cans and cigarettes. On July 20, 2017, a pedestrian was struck by a brick that fell from the Building and the brick tore through her coat and wounded her back. Homeless people entered through a broken back door and slept in the Building. Trespassers on the roof of the Building were a constant problem, and there was an incident involving throwing bottles. Trespassers would also spray graffiti in the Building's interior, and break windows and doors. Pittsfield's property manager, Constance Rasmussen, stated the building was a mess. Pittsfield had 24/7 security consisting of one security guard who sat at the Washington Street entrance and did not move about the Building.

The Building suffered from plumbing issues, including leaks and flooding. Its fire escapes were also in a state of disrepair and collapsed onto the sidewalk below.

After the Building was placed in receivership, CR Realty was appointed as the first receiver in 2011, primarily to work on the Building's elevators. CR Realty expressed frustration with the progress of the receivership, noting that work was not being completed and the Building's management wanted to move at their own pace and constantly failed to provide accurate information relating to work on the Building.

5

Pittsfield's witnesses believed that development of a hotel within the Hotel Property was an attractive option from a financial perspective because it provided significantly enhanced value over other uses. Development arranged for Kulak to pay the $150 application fee and write a letter to the Zoning Administrator for the City's Department of Housing and Economic Development ("DHED"). The letter, dated April 2, 2014, requested an advisory opinion that a 210-room hotel in the Hotel Property would be an allowable use under the zoning then in place. On May 1, 2014, the DHED's Assistant Zoning Administrator wrote back to Kulak, advising that "a 210-room hotel with associated hotel operations . . . is a permitted use in the DX-16 district and therefore would be allowed to establish by-right at the subject site" pursuant to section 17-04-0207-II of the City's Zoning Ordinance ("May 2014 Letter"). After receiving the May 2014 Letter, Development organized Hotel on May 12, 2014, as an investment vehicle to take title to the Hotel Property and develop and operate a hotel on the Hotel Property. CHP, which was never a member of Development, also organized Hotel.

In reliance on the existing DX-16 zoning and the May 2014 Letter, Development moved forward with arranging for the development of a hotel on the Hotel Property ("Hotel Development Project"). This included expending hundreds of thousands of dollars on hiring professionals such as engineers, architects, and consultants. The City disputes that Development expended hundreds of thousands of dollars, pointing to testimony from Kulak, as well as Pittsfield's general contractor, George Karambinis of Spartan Contractors, Inc. ("Spartan"), that they were regularly not paid for their work

6

or were paid egregiously late.[2]

Within the Hotel Property, Development stopped marketing space for lease, stopped renewing existing leases, and negotiated the relocation of rent-paying tenants out of the Building. This created a significant drop off in revenue from the Pittsfield Properties. By removing rent-paying tenants from the Hotel Property (and elsewhere in the Pittsfield Properties), Development and Hotel denied themselves income from ongoing Building operations, resulting in increasing losses in 2014–2017.[3]

On May 5, 2015, Hotel filed an application with the City's Department of Buildings to develop a 191-room hotel on the Hotel Property ("Application"). All reviews associated with the Application, i.e., fire prevention, zoning, landmark, plumbing, environmental, etc., were approved. The Application represented that the cost of construction was $7.68 million. The budget, put together by Spartan, reflected a project cost of $23.6 million.

Spartan was the sole general contractor listed on the Application. Spartan held a Class B General Contractor License. In relation to the Building demolition, Rasmussen observed Karambinis directing children to remove debris from the Building.

On June 4, 2015, moving forward with plans for the Hotel Development Project,

---

[2] The City also claims the allegedly paid invoices constitute inadmissible hearsay because Pittsfield "identified no witnesses in their Rule 26(a) disclosures who could authenticate and render the records admissible as business records." Dkt. # 191, at 9. The parties did not provide the Court with enough information to make that determination and we thus disregard the hearsay objection.

[3] City disputes this fact, asserting that Hotel did not own the Hotel Property until June 4, 2015, and that the rent was paid to Development, not Hotel.

Development conveyed floors 2–8 of the Building to Hotel and Residential conveyed floor 9 to Hotel.

Throughout 2015, Pittsfield failed to pay taxes and received a Delinquent Tax Notice from Cook County on August 6, 2015. It stated that the collective Pittsfield Properties were sold for delinquent taxes. Pittsfield then owed $3,278,887 in unpaid real estate taxes.

On December 10, 2015, the Department of Buildings issued the Permit, building permit no. 100627025, to Hotel to convert the Hotel Property to a hotel with 191 rooms. Hotel then started demolition on floors 7 and 8 of the Hotel Property.

Adam David Lynd was a prospective purchaser of the Building who expressed an interest in converting the Building to residential use. On August 3, 2015, Pittsfield entered into a contract ("Purchase Contract") with Adam David Partners I, LLC ("Prospective Buyer"), an entity created by Lynd, to sell all of the Pittsfield Properties (except floors 13–21 that were previously conveyed to 55 East Washington Development, LLC, an unrelated third party) to the Prospective Buyer for $36 million. Prospective Buyer still wanted to purchase the Building even after learning about the Ordinance because it wanted to build residential units, including luxury residential units, which Lynd viewed as an economically viable use for the property. According to Lynd, the Ordinance had nothing to do with the sale falling through—rather, it fell through because of the personalities involved.

On September 15, 2015, representatives of the Prospective Buyer met with

Alderman Reilly (the Alderman for the 42nd Ward, where the Building is located) and his staff and discussed Hotel's plans to convert the Hotel Property into a hotel. On November 10, 2015, i.e., one month before the Permit issued, the Prospective Buyer defaulted on the Purchase Contract and forfeited its $500,000 deposit to Pittsfield.

On December 22, 2015, the Lynd Company made a $1,500 campaign donation to Citizens for Alderman Reilly.[4]

Lynd remained interested in purchasing the Building at the same price, even after learning of Alderman Reilly's opposition to the Hotel Development Project. On February 9, 2016, Prospective Buyer sent a letter of intent offering to buy the Building for $87 million, with $35.5 million allocated to Pittsfield's portion of the Building.

On February 10, 2016, Alderman Reilly introduced Ordinance No. O2016-811 ("Ordinance") to the City Council, which proposed to change the zoning of the Building from DX-16 (Downtown Mixed Use District) to DR-10 (Residential Use Downtown District). DR-10 zoning does not permit use as a hotel or office, thereby preventing Hotel from proceeding with the Hotel Development Project or re-letting office space in the Hotel Property that was previously vacated in preparation for the Hotel Development Project.

In a letter dated March 9, 2016, to Daniel Solis, Chairman of the Committee on Zoning, Landmarks, and Building Standards ("Zoning Committee"), Alderman Reilly

---

[4] City contends this document is "inadmissible hearsay" but does not explain why.

stated that the Ordinance was introduced to, *inter alia*: (1) "halt" a building program (i.e., the Hotel Development Project); (2) "downzone and throw [the Building] into non-conformance"; (3) "assist new ownership", i.e., the Prospective Buyer who already defaulted on the Purchase Contract; and (4) "hit the pause button" on the Hotel Development Project. At a Zoning Committee meeting on March 14, 2016, it was recommended that the Ordinance be passed.

The Chicago City Council passed the Ordinance during a meeting held on March 16, 2016. The Ordinance contains no language indicating it was a temporary measure.

Prior to the Ordinance, Pittsfield was working with a real estate agency called CBRE to market their interests in the Building. CBRE procured 83 separate confidentiality agreements from potential buyers. For example, DeBartolo Properties, LLC offered to purchase the Building for $79 million, Pramana Global, LLC offered to purchase the Building for $83 million, Brijus Capital, LLC offered to purchase the Building for $72.3 million, and Akara Partners, LLC offered to purchase the Building for $83.5 million.[5] None of these offers progressed to a contract to purchase.

After the Ordinance went into effect, interest in purchasing the Building ceased, or at the least, decreased. The City disputes this fact, pointing to testimony that the Ordinance in some cases had no effect on the purchase offers and that one of the potential buyers actually increased their offer after the zoning change was proposed, the

---

[5] City objects to these letters of intent as hearsay but does not explain why John Jaeger of CBRE, who was asked about these documents at his deposition, could not offer his personal knowledge of the offers, or why the letters would not meet the business record exception as records of CBRE.

fact that Pittsfield eventually sold their collective interests in the Building for $20.8 million, and the fact that Pittsfield chose to stop marketing their properties following the Ordinance's enactment.

Even after the Building was downzoned from DX-16 to DR-10, Pittsfield tried to move forward with the Hotel Development Project. Scheinblum continued to communicate with the City about the Hotel Development Project, including via an email sent on June 2, 2016, to a supervisor in the Department of Buildings stating that Pittsfield had only completed demolition of floor 8 but that the project was still active. Karambinis went to City Hall to ask if the Permit was still valid and was told that it was. Hotel continued working under the Permit after the Ordinance's enactment.

On March 29, 2016, Scheinblum met with Alderman Reilly and his staff who told him that even if a hotel was built, Hotel would not get a license to operate it.

To move forward with the Hotel Development Project, it was necessary to procure financing or investment capital. The City disputes this fact, pointing to the testimony of Brian Scheinblum (a representative of Hotel) that Pittsfield could have funded the hotel themselves, and obtaining financing was not necessary.

Pittsfield attempted to make a deal with a potential purchaser/investor, Trevian Capital, to either purchase Pittsfield's interest in the Building or to fund construction of a hotel but the deal was never made.

On behalf of Hotel, Scheinblum sought to secure a lease agreement with Hotusa Group ("Hotusa") for a hotel on the Hotel Property. This resulted in a letter of intent

from Hotusa, dated September 28, 2015, whereby Hotusa would retain a purchase option to acquire the hotel for $350,000 per key.[6]  At 191 rooms, this would be a purchase option of $66,850,00.  A lease was never entered into.

Prior to the Ordinance, Hotel was in talks with potential financiers.  Hotel had a signed term sheet, dated May 28, 2015, from a lender called TPG for $18 million.  The proposed project was converting the Hotel Property to a "196-key Crowne Plaza Hotel." Dkt. # 172-9.[7]  The "Franchise Agreement" section of the term sheet stated:

> Prior to closing, Borrower shall be required to deliver a satisfactory executed Franchise Agreement with InterContinental Hotels Group (IHG) or equivalent hotel operator, for the establishment of a Crowne Plaza Hotel, or equivalent flag, at the Property, with satisfactory documentation under which IHG (or its equivalent) will attorn to Lender in the event of the initiation or completion foreclosure.

*Id*.  The City disputes this fact, pointing to Scheinblum's testimony that signing a franchise agreement with Crowne Plaza was not a prerequisite of obtaining financing from TPG and that the TPG loan did not go forward because TPG "got out of the business" and "were no longer doing those types of loans."  Dkt. # 191, at 28.

Hotel entered into a term sheet with IHG, which had Crowne Plaza and Kimpton under its umbrella.  Hotel never signed a franchise agreement with Crowne Plaza, nor entered into an agreement with Kimpton to put a hotel in the Building.  Scheinblum believes that if the Building was not downzoned, Hotel would have been able to enter

---

[6] City objects to the letter of intent as hearsay but does not explain why it would not meet the business record exception as a record of Hotel.

[7] The Court overrules City's hearsay objection to the term sheet.  *See supra* note 6.

agreements with IHG, Crowne Plaza, Kimpton, or another comparable hotelier. He also believes that Hotel could not have obtained a lease without getting the zoning changed back, and that the downzoning was the reason Hotel was unable to procure a lease or franchise agreement for the Hotel Development Project. According to Scheinblum, the Hotel Development Project "was stopped cold in its tracks." Dkt. # 172-5.

Robert Danial, Pittsfield's manager, also believes that the Ordinance "put a halt to our plans to develop a hotel on the Hotel Property", "rendered the Hotel Property to be useless", and prevented and/or restricted Pittsfield's ability to lease space in the Building, thus rendering the Hotel Property "useless and burdensome liabilities as [Pittsfield] could no longer generate sufficient income to sustain their operations." Dkt. # 172-4, ¶¶ 34–35. According to Danial, after the Ordinance, the only Pittsfield Property that was "generating any meaningful income and operating at a profit was the Residential Property." *Id.*, ¶ 40. The City disputes this fact, noting that Residential declared bankruptcy in 2011, i.e., years before the 2016 Ordinance.

Alderman Reilly was "probably" aware at the time he sponsored the Ordinance that, if approved, it could affect the Hotel Development Project's financing.

Pittsfield engaged an auctioneer and held auctions for the Pittsfield Properties on February 28, 2017, and March 1, 2017, but did not procure a buyer at that time.

The City never offered Pittsfield any compensation for their losses incurred as a result of the Ordinance.

On March 26, 2017, Development filed a voluntary Chapter 11 bankruptcy

13

petition with the United States Bankruptcy Court for the Northern District of Illinois ("Bankruptcy Court") in case number 17-09513. On May 31, 2017, the Bankruptcy Court ordered the sale of the Pittsfield Properties. On June 27, 2017, an auction was held where the Pittsfield Properties were sold for a total sales price of $20.8 million, which closed on August 26, 2017. The proceeds of the sale were allocated as follows: 31% ($6.45 million) to Development; 38% ($7.9 million) to Residential; and 31% ($6.45 million) to Hotel for floors 2–9, of which $2.16 million was disbursed to CHP (exactly matching the amount CHP paid for its interest in Hotel).

## LEGAL STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citation omitted). "A genuine dispute as to any material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Kvapil v. Chippewa Cnty.*, 752 F.3d 708, 712 (7th Cir. 2014) (cleaned up).

In deciding whether a dispute exists, the Court must "construe all facts and reasonable inferences in the light most favorable to the non-moving party." *Citizens for Appropriate Rural Roads v. Foxx*, 815 F.3d 1068, 1074 (7th Cir. 2016). The nonmovant "must go beyond the pleadings" to demonstrate that there is evidence "upon which a jury could properly proceed to find a verdict in [their] favor." *Modrowski v.*

14

*Pigatto*, 712 F.3d 1166, 1168–69 (7th Cir. 2013). "The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement." *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). And "[c]onclusory statements, not grounded in specific facts" cannot defeat a motion for summary judgment. *Bordelon v. Bd. of Educ.*, 811 F.3d 984, 989 (7th Cir. 2016) (cleaned up).

Not all factual disputes will preclude the entry of summary judgment, only those that "could affect the outcome of the suit under governing law." *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001) (citation omitted). In deciding a motion for summary judgment, the Court's sole function is "to determine whether there is a genuine issue for trial." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014). The Court cannot weigh conflicting evidence, assess the credibility of witnesses, or determine the ultimate truth of the matter, as these are functions of the jury. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986); *Omnicare, Inc. v. UnitedHealth Grp., Inc*., 629 F.3d 697, 704–05 (7th Cir. 2011).

Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The party opposing the motion for summary judgment is then required to file "any opposing affidavits and other materials referred to in [Federal Rule of Civil Procedure 56(e)]" and a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R.

56.1(b)(1), (3).

"A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000). Local Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted," *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). If a response to a statement of material fact provides only extraneous or argumentative information, this response will not constitute a proper denial of the fact, and the fact is admitted. *See Graziano v. Vill. of Oak Park*, 401 F. Supp. 2d 918, 936 (N.D. Ill. 2005). Similarly, if a statement of fact contains a legal conclusion or otherwise unsupported statement, including a fact that relies upon inadmissible hearsay, such a fact is disregarded. *Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

## DISCUSSION

### I. Pittsfield's Motion for Partial Summary Judgment

Pittsfield's motion for partial summary judgment argues they are entitled to judgment in their favor on Count I, Count II, and the City's affirmative defenses for

ripeness and mitigation of damages.[8]  For the following reasons, Pittsfield's motion is granted-in-part and denied-in-part.

### a.  Count II: Taking of Hotel's Permit[9]

The Takings Clause provides: "[N]or shall private property be taken for public use, without just compensation."  U.S. Const., Amdt. 5.  The Takings Clause is intended to compensate with money an individual whose property rights are impacted by government action.  *Tahoe-Sierra Preservation Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002).  A Fifth Amendment takings claim requires the Court to engage in a two-part analysis: (1) whether there was a protected property right, and (2) whether the property was taken.  *See Pittsfield Dev., LLC v. City of Chi*., 2017 WL 5891223, at *4 (N.D. Ill. 2017) (Kocoras. J.).

Pittsfield first argues that the Court already determined at the motion to dismiss stage that Hotel held a protected property right in the Permit.  The Court addressed this issue in three separate orders, including in-depth legal analysis, at the pleadings stage of this case.  Dkt. # 20; Dkt. # 54; Dkt. # 74.  In particular, the March 2019 Order stated that, according to the allegations of the complaint, the Permit "fits squarely within the Illinois' vested rights doctrine" and that:

> Pittsfield sufficiently pled facts affording property right interests to the Permit.  Pittsfield has alleged that it was issued a valid permit.  As

---

[8] Pittsfield moved for summary judgment as to all eight of the City's affirmative defenses, but the City chose to defend only two of them.

[9] Because Pittsfield's briefing begins with Count II then proceeds to Count I, we do the same here for ease of reference.

discussed at great lengths in the November Order, the Court need not question whether Pittsfield's demolition of three whole floors anticipated some presupposed permit, because an actual permit, *the* Permit, was issued after both extensive demolition and the spending of hundreds of thousands of dollars on the Permit application.

Dkt. # 54, at 11, 13 (emphasis in original). We also concluded at that stage that Pittsfield's "vested right" in the Permit gave rise to a property interest compensable as a taking because the right was "so complete and unconditional that it may be equated with a property interest." *Id*. at 15; *see Bell v. City of Country Club Hills*, 841 F.3d 713 (7th Cir. 2016). The Court's view of the allegations was as follows:

> "Whether acting through its judiciary or through its Legislature, a state may not deprive a person of all existing remedies for the enforcement of a right, which the state has no power to destroy, unless there is, or was, afforded to him some real opportunity to protect it." We agree with Pittsfield that it had no real opportunity to protect its rights because applying for a writ of mandamus was not a viable option after the [] Ordinance. Pittsfield has plausibly alleged that reputable hotel brands and operators could not be reasonably expected to proceed with such a development given the hostile political environment. The [] Ordinance and lack of subsequent funding for Hotel's development ultimate[ly] forced the bankruptcy of the Pittsfield building and disposition of the Properties at a liquidation sale. Pittsfield's assertions are especially plausible because the [] Ordinance was not enacted until after Alderman Reilly publicly voiced his opposition to the operation of a hotel in the Building, which curiously happened two months after the issuance of the Permit.

Dkt. # 54 at 16 (citation omitted).

As we have stated, in the case of "vested property" rights in Illinois, "a 'writ of mandamus' [is] the proper form of equitable relief", Dkt. # 74 (citing *Pioneer Tr. & Sav. Bank v. Cook Cnty.*, 377 N.E.2d 21, 22 (Ill. 1978)). We previously found that

Pittsfield sufficiently alleged a vested property right in the Permit because it "plausibly alleged that reputable hotel brands and operators could not be reasonably expected to proceed with such a development given the hostile political environment" and therefore Pittsfield "had no real opportunity to protect its rights because applying for a writ of mandamus was not a viable option after the [] Ordinance." *Id.*

Pittsfield now presents evidence of the "hostile political environment," such as Alderman Reilly's introduction of the Ordinance two months after the Permit issued, his letter to Solis stating the Ordinance was intended to "halt" the Hotel Development Project and throw the Building into non-conformance, and that none of the potential purchases or lease agreements for the Pittsfield Building came to fruition after the Ordinance was enacted. Although the City has shown that at least one potential buyer (Lynd) was willing to go through with purchasing the Building even after learning of the Ordinance because his company wanted to build luxury *residential* units in the building, that says nothing about Hotel's ability to proceed with developing a *hotel* based on the Permit.

The City has not raised sufficient facts to defeat summary judgment on this basis and we maintain our view that Pittsfield has demonstrated a property interest in the Permit and that pursing a writ of mandamus was not viable.

### i. Total Regulatory Taking of the Permit Under *Lucas*

We find that Pittsfield cannot show that a total regulatory taking of the Permit under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992) occurred. Pittsfield

19

contends the Ordinance "confiscated" the Permit, and offers a conclusory argument that the Permit was "rendered worthless" by the Ordinance and therefore they were "deprived of all economically beneficial uses" of the Permit under *Lucas*.

In response, the City argues that *Lucas* only applies to real property (i.e., land), and cannot apply to personal property like a permit. We agree.[10] *See Horne v. Dep't of Agric.*, 576 U.S. 351, 360–61 (2015) (noting that with respect to regulatory takings, "*Lucas* recognized that while an owner of personal property 'ought to be aware of the possibility that new regulation might even render his property economically worthless,' such an 'implied limitation' was not reasonable in the case of land."); *Lucas*, 505 U.S. at 1027 ("And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . .").

Pittsfield makes no meaningful response to this argument, stating only that it "does not matter whether the analysis is under *Lucas* or *Penn Central*" and referencing its response to the City's summary judgment motion. Dkt. # 195, at 6. But that response does not cite any cases in which a court applied *Lucas* to personal property. *See* Dkt. # 189, at 21–22. Thus, Pittsfield's response is waived. *See Crespo v. Calvin*, 824 F.3d 667, 674 (7th Cir. 2016) ("Arguments that are unsupported by pertinent

---

[10] Although the Court held at the motion to dismiss stage that Pittsfield had sufficiently alleged a *Lucas* taking, the City's real property argument was not presented to the Court at that time.

authority[] are waived . . . . "); *Urban 8 Fox Lake Corp. v. Nationwide Affordable Hous. Fund 4, LLC*, 2019 WL 5963644, at \*2 (N.D. Ill. 2019) ("Arguments unsupported by applicable case law are deemed waived.").

### ii. Partial Regulatory Taking of the Permit Under *Penn Central*

Pittsfield also cannot show a partial taking of the Permit. When a regulation impedes the use of property without depriving the owner of all economically beneficial use, a partial regulatory taking under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), may be found on a "complex of factors": (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action. *Murr v. Wisconsin*, 582 U.S. 383, 387 (2017).

Regarding the investment-backed expectations factor, Pittsfield contends they had an expectation of building a hotel on the Hotel Property in light of the City's May 2014 Letter, as well as the issuance of the Permit. Furthermore, Hotel was organized as an investment vehicle to take title to, develop, and operate a hotel on the Hotel Property, and Hotel laid out capital and sustained revenue losses in anticipation of developing a hotel. The City counters that Development (not Hotel, who brings this claim) is the entity that actually made expenditures and sustained monetary losses, and cites evidence that Pittsfield failed to pay invoices from its general contractor.[11]

As to the "character of the government action" factor, Pittsfield initially argued

---

[11] The City makes other arguments as well but does not support them with citations to the record.

only that the Ordinance was "draconian." The City responded that Pittsfield's argument missed the mark because the factor "turns on whether the government action is akin to a physical invasion by the government or more fairly characterized as some public program adjusting the benefits and burdens of economic life to promote the common good." Dkt. # 192, at 11 (quoting *Home Builders Ass'n of Greater Chi. v. City of Chi.*, 213 F. Supp. 3d 1019, 1029 (N.D. Ill. 2016)). Pittsfield replied that the Ordinance effectively "confiscated" the Permit, which is tantamount to a physical taking. Dkt. # 195, at 9 (citing *Wheeler v. City of Pleasant Grove*, 664 F.2d 99, 100 (5th Cir. 1981), and *G.T. Scott v. Greenville Cnty.*, 716 F.2d 1409, 1421 (4th Cir. 1983)).

As to economic impact, Pittsfield argues (among other things) that the Permit was "rendered worthless" by the Ordinance. The Permit was granted to build a hotel on the Hotel Property, but the Ordinance downzoned the Building from DX-16 to DR-10 and DR-10 does not allow for hotel use.

The City responds that Pittsfield offers no evidence regarding the Permit's value at any time—their expert did not value the Permit—and the economic impact analysis "primarily turns on consideration of the fair market value of the allegedly taken property before and after the challenged regulation." Dkt. # 192, at 8–9. We agree with the City—Pittsfield has come forth with no evidence specific to the Permit to establish its value before and after the Ordinance. The only evidence regarding value is with respect to the Hotel Property, not the Permit specifically. We found in our order on the motion to exclude that Pittsfield's expert did not opine on the value of the Permit. Dkt. # 223,

at 8–9.  And Pittsfield's argument that the Ordinance rendered the Permit "worthless" is conclusory.  Pittsfield has therefore failed to provide any evidence of the Ordinance's economic impact on the Permit.

Even if the Ordinance did effectively confiscate the Permit, whatever value the Permit held was in the fact that it gave Hotel the ability to move forward with the Hotel Development Project.  There is no evidence from which to conclude that the Permit held its own monetary value separate from the Hotel Property or what impact there may have been on that value.  To the extent the Permit held value, it was subsumed into the value of the Hotel Property.  Summary judgment in Pittsfield's favor on Count II is therefore denied.

### b.  Count I: Taking of the Hotel Property

Next, we address Hotel's claim that the Ordinance constituted a taking of the Hotel Property.  The City includes one cursory paragraph stating that Hotel lacked a property interest in the Hotel Property, which merely cites the City's own summary judgment motion and does not include any additional law or factual support.  *See* Dkt. # 192, at 7.  We therefore proceed to analyzing the takings claim under the relevant frameworks, and find that Pittsfield has shown there was an unconstitutional taking under *Lucas*.  Summary judgment on Count I is granted in Pittsfield's favor.

Hotel argues that it was "denied all beneficial economic use of the Hotel Property" after the Ordinance was enacted, and thus they are entitled to summary judgment in their favor on whether there was a *Lucas* taking.  Dkt. # 170, at 11.  It cites

23

the multiple letters of intent to purchase its interests in the Building, and the fact that after the Ordinance, none of those transactions closed. Pittsfield's manager testified that he believed the Ordinance "rendered the Hotel Property to be useless" and prevented and/or restricted Pittsfield's ability to lease space in the Building thus rendering the Hotel Property "useless and burdensome liabilities as [Pittsfield] could no longer generate sufficient income to sustain their operations." Dkt. # 172-4, ¶¶ 34–35. Furthermore, within the Hotel Property, Development also stopped marketing space for lease, stopped renewing existing leases, and negotiated the relocation of rent-paying tenants out of the Building. This created a significant drop in revenue from the Pittsfield Properties. By removing rent-paying tenants from the Hotel Property (and elsewhere in the Pittsfield Properties), Development and Hotel denied themselves income for ongoing Building operations, resulting in increasing losses in 2014–2017. Hotel also demolished floors 7 and 8 of the Hotel Property after the Permit issued.

The City argues that *Lucas* cannot apply to Hotel's interests in the Hotel Property because "the Ordinance allows those floors to be developed under the full range of economically viable uses permitted under DR-10 zoning." Dkt. # 192, at 8. This one-sentence, bare bones argument, with no citation to any record evidence, is insufficient to defeat summary judgment. *See Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017) ("As the 'put up or shut up' moment in a lawsuit, summary judgment requires a non-moving party to respond to the moving party's properly-supported motion by identifying specific, admissible evidence showing that there is a genuine dispute of

24

material fact for trial." (cleaned up)); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010) (nonmovant "must do more than raise some metaphysical doubt as to the material facts; he must come forward with specific facts showing that there is a genuine issue for trial." (cleaned up)).

The Court agrees with Pittsfield that the Ordinance "denie[d] all economically beneficial or productive use" of the Hotel Property. *See Lucas*, 505 U.S. at 1019. The facts are quite straightforward here—Pittsfield obtained the City's blessing to move forward with the Hotel Development Project. It then removed tenants, expended money, and demolished several floors of the Hotel Property in reliance on that blessing. The City then changed its mind and expressed its reversal in multiple ways, i.e., Reilly introducing the Ordinance, Reilly's letter to Solis stating the Ordinance was intended to stop the Hotel Development Project and throw the Building into non-conformance, and the City enacting the Ordinance. Unable to move forward with the Hotel Development Project, the purpose for which Hotel made its financial decisions regarding the Hotel Property, the Hotel Property lost its economic value to Hotel. *See Lingle v. Chevron*, 544 U.S. 528, 539–40 (2005) ("In the *Lucas* context, [] the complete elimination of a property's value is the determinative factor."); *Lucas*, 505 U.S. at 1017 ("total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation.").

We therefore grant summary judgment in Pittsfield's favor on Count I under the *Lucas* framework, and do not proceed to the *Penn Central* analysis.

25

### c. The City's Affirmative Defenses

Finally, Pittsfield moves for summary judgment on the City's eight affirmative defenses: (1) no damages; (2) laches; (3) reservation of rights to add affirmative defenses; (4) ripeness; (5) waiver; (6) failure to mitigate damages; (7) mootness; and (8) estoppel.  In response, the City chose to defend only its fourth (ripeness) and sixth (mitigation of damages) affirmative defenses, and thus summary judgment is granted in Pittsfield's favor on the City's first, second, third, fifth, seventh, and eighth affirmative defenses.

The City's fourth affirmative defense is a ripeness defense, stating that Pittsfield's "claims are not ripe for review in this Court because Plaintiffs have not pursued compensation through state procedures and have not received a final decision regarding the application of the regulations to the property at issue."  Dkt. # 59, at 39. Pittsfield argues that the defense relies on the Supreme Court's holding in *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 105 S. Ct. 3108 (1985), which was abrogated by *Knick v. Twp. of Scott, Pennsylvania*, 139 S. Ct. 2162 (2019).  The City responds:

> This is a misstatement of the law.  *Knick* overruled only one prong of the *Williamson County* ripeness test, such that litigants no longer need[] to seek just compensation in state court before seeking just compensation in federal court.  But the requirement that a litigant must seek a final decision from the government regarding how the challenged land use regulation applies to the property at issue remains good law.  *See Pakdel v. City and Cnty. of San Francisco, CA*, 141 S. Ct. 2226, 2228 (2021) ("When a plaintiff alleges a regulatory taking in violation of the Fifth Amendment, a federal court should not consider the claim before the government has

reached a 'final' decision.").

Dkt. # 192, at 12.

On reply, Pittsfield cites the Court's March 2019 Order finding that "Pittsfield has plausibly alleged that reputable hotel brands and operators could not be reasonably expected to proceed with such a development given the hostile political environment." Dkt. # 195, at 12 (citing Dkt. # 54, at 7). Because we find that Pittsfield has presented evidence to support that ruling, i.e., that pursuing a writ of mandamus was not a viable option because of the hostile political environment, *see supra*, we also find it appropriate to grant summary judgment in Pittsfield's favor on the City's ripeness defense.

The City's sixth affirmative defense claims that Pittsfield "did not take reasonable steps to mitigate their alleged damages" and so their claims are limited or barred entirely. Pittsfield argues that they did attempt to mitigate their damages by "unsuccessfully [trying] to see the Hotel Development Project through, even after the [] Ordinance was enacted" and "unsuccessfully [trying] to auction their Properties." Dkt. # 170, at 14. But the City raises genuine factual disputes, arguing that Lynd was still willing to purchase the Pittsfield Building (for more than they ultimately got for it at the bankruptcy auction), but Pittsfield declined that offer.[12] Therefore, "the jury must determine whether [Pittsfield's] . . . efforts constituted reasonable diligence to

---

[12] The City also argues that Pittsfield failed to pursue a writ of mandamus, but we already rejected that argument. *See supra*.

mitigate [their] damages." *Jankowski v. Dean Foods Co*., 378 F. Supp. 3d 697, 713 (N.D. Ill. 2019) (citing *Kasper v. Saint Mary of Nazareth Hosp*., 135 F.3d 1170, 1176 (7th Cir. 1998)).

Summary judgment is granted as to the City's fourth affirmative defense and denied as to the City's sixth affirmative defense.

## II.     The City's Motion for Summary Judgment

Next, we turn to the City's motion for summary judgment, seeking judgment in its favor on all five of Pittsfield's claims. Because we granted Pittsfield's summary judgment motion as to a taking of the Hotel Property (Count I), we address only those aspects of the City's motion pertaining to the Permit (Count II) and the substantive due process claims (Counts III–V). The City makes several arguments in support of its motion: (i) Pittsfield did not have constitutionally protected property interests; (ii) the Ordinance was not the actual and proximate cause of Hotel's alleged injuries; (iii) the Ordinance did not effectuate a partial regulatory taking; (iv) Hotel cannot establish a complete taking of the Permit; and (v) Pittsfield's  substantive due process claims are not viable. We do not address arguments (i) and (ii) because we find summary judgment in the City's favor is warranted on the merits of Counts II–V. For the following reasons, the City's motion is granted-in-part and denied-in-part.

### a.  Partial Regulatory Taking of the Permit Under *Penn Central*

The City argues that the Ordinance did not effectuate a partial regulatory taking of the Permit under the *Penn Central* analysis. As stated above, when a regulation

impedes the use of property without depriving the owner of all economically beneficial use, a partial regulatory taking under *Penn Central* may be found on a "complex of factors": (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action. *Murr*, 582 U.S. at 387. We find that summary judgment in the City's favor is warranted as to the Permit under the *Penn Central* test. Hotel has come forward with no evidence regarding the economic impact of the Ordinance on the Permit and thus, even if the other two factors are closer calls, no reasonable jury could find in Hotel's favor.

As to the reasonable investment-backed expectations factor, the City argues that a reasonable investor would not have expended the substantial amounts of money on the Hotel Development Project that Hotel did because it "did not even own the subject property due to an enormous tax delinquency" and would not have removed the few rent-paying tenants it had "in anticipation of building out a pipe dream hotel." Dkt. # 179, at 20–21. Furthermore, it was "unreasonable to assume that [Hotel] would be able to get all required licenses and permits to operate a speculative hotel after making no efforts to obtain those authorizations," and "Hotel's expectations were all the less reasonable given then egregious mismanagement of the building." *Id*. at 21. Pittsfield counters that it was reasonable to expect to develop a hotel on the Hotel Property when the City issued the Permit to do so, and it was not reasonably expected that the City would downzone the Hotel Property shortly thereafter. There is a question of fact

29

regarding whether Pittsfield's investment-backed expectations were "reasonable."

As to character of the government action, the City argues that it "acted in a manner that balanced burdens and benefits of economic life for the common good" and "regulated a building that had become a menace to the community while still permitting the owners of the building to engage in a wide array of profitable and economically viable property uses." Dkt. # 179, at 22. In response, Pittsfield cites case law finding takings occurred where property was effectively "confiscated" as well as evidence that the purpose of enacting the Ordinance was to "halt" the Hotel Development Project and "throw [the Building] into non-conformance." Dkt. # 189, at 20–21. This is enough to raise a dispute of material fact as to whether the Ordinance was akin to a "physical invasion by the government" as opposed to an interference meant to "promote the common good." *See Penn Central*, 438 U.S. at 124.

The parties' arguments as to the economic impact[13] on the Permit are essentially the same arguments discussed above in conjunction with Pittsfield's motion for summary judgment. *See supra*. As before, the City argues that the "economic impact factor primarily turns on consideration of the fair market value of the allegedly taken property before and after the challenged regulation," Dkt. # 208, at 15, that Pittsfield

---

[13] As to the first *Penn Central* factor, the City argues that the proper "denominator" for evaluating economic impact is Pittsfield's collective interests in the Building plus the Permit, rather than the Permit on its own, and that the economic impact on these interests was too small to support finding that a taking occurred. And even if the Permit is assessed separately, the City argues, this factor still does not weigh in favor of establishing a taking. Because we find that, even assessing the Permit alone, Pittsfield cannot make out a claim for the Permit under *Penn Central*, we do not analyze this argument.

30

has "adduced no evidence regarding the Ordinance's economic impact on the [Permit]", Dkt. # 179, at 16, and that the Permit is nontransferable, *id*. The City cites *Seiber v. U.S.*, 364 F.3d 1356, 1371 (Fed. Cir. 2004) for the proposition that "the failure to provide evidence to support the existence of economic injury is fatal to a takings claim." *Id*. at 17. In response, Pittsfield cites only evidence regarding the value of the Hotel Property, not the Permit. *See* Dkt. # 189, at 17. Pittsfield has come forward with no evidence of economic impact on the Permit. As discussed *supra*, whatever value the Permit may have had was subsumed into the value of the Hotel Property. So, to the extent Pittsfield argues that the Permit was "confiscated" and therefore the taking was "total," it is not enough to defeat summary judgment. Even if the other two factors are closer calls, the lack of evidence supporting economic impact means Pittsfield cannot make out a claim under *Penn Central*.

### b. Total Regulatory Takings under *Lucas*

Under *Lucas*, a regulatory taking occurs when a "regulation denies all economically beneficial or productive use of land." 505 U.S. at 1019. This requires a "complete elimination of value" or a "total loss." *Tahoe-Sierra*, 535 U.S. at 330. Because Pittsfield has raised no genuine disputes of material fact, we grant summary judgment in the City's favor as to the Permit under *Lucas*.

As it did with respect to Pittsfield's motion for summary judgment, the City argues that Hotel cannot establish a total regulatory taking of the Permit under *Lucas* because that analysis applies only to land or real property, as opposed to personal

property.  Dkt. # 179, at 22–23 (citing *Tahoe-Sierra*, 535 U.S. at 330; *Lucas*, 505 U.S. at 1015–19; *Hawkeye Commodity Promotions, Inc.*, 486 F.3d 430, 441 (8th Cir. 2007); *Philip Morris, Inc. v. Reilly*, 312 F.3d 24, 35 (1st Cir. 2002); *Unity Real Estate Co. v. Hudson*, 178 F.3d 649, 675 (3d Cir. 1999); *Parkridge Inv'rs, Ltd. P'ship v. Farmers Home Admin.*, 13 F.3d 1192, 1199 (8th Cir. 1994)).

And as before, Pittsfield argues that "it does not matter whether or not *Lucas* applies as *Penn Central* does in fact apply to [the] matter at bar."  Dkt. # 189, at 22.  It cites no cases in which a court applied *Lucas* to personal property.  *Id*. at 21–22.  Thus, this argument is waived.  *See Crespo*, 824 F.3d at 674; *Urban 8 Fox Lake*, 2019 WL 5963644, at *2.

The *Lucas* analysis is inapplicable to the Permit.  *See Horne*, 576 U.S. at 360–61 (noting that with respect to regulatory takings, "*Lucas* recognized that while an owner of personal property 'ought to be aware of the possibility that new regulation might even render his property economically worthless,' such an 'implied limitation' was not reasonable in the case of land."); *Lucas*, 505 U.S. at 1027 ("And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [the owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . .").  Because we also found that Pittsfield failed to raise a dispute of material fact regarding the Permit under the *Penn Central* analysis, summary judgment is granted in the City's favor on Count II.

32

### c.  Counts III–V: Substantive Due Process Claims

Finally, the City seeks summary judgment on Pittsfield's substantive due process claims in which Pittsfield argues that the Ordinance was not rationally related to any legitimate interests of the City.  Count III is brought by Hotel regarding its interests in the Permit and Hotel Property, Count IV is brought by Development regarding its interests in the Tower, and Count V is brought by Residential regarding its interests in floors 10–12 of the Building.  The City argues that summary judgment in its favor is warranted as to all three claims for two reasons: (1) the Ordinance had rational bases; and (2) Pittsfield had adequate state law remedies and there is no independent constitutional violation.  Summary judgment is warranted in the City's favor on Counts III, IV, and V because there were conceivable rational bases for the Ordinance.

Where a zoning ordinance interferes with an entity's property interest, "substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational."  *Lee v. City of Chi.*, 330 F.3d 456, 467 (7th Cir. 2003).  "A zoning decision denies substantive due process only if it is invidious or irrational."  *Harding v. Cnty. of Door*, 870 F.2d 430, 431 (7th Cir. 1989).  "[F]ederal courts . . . are not zoning boards of appeal.  State and local land-use decisions are entitled to great deference when constitutional claims are raised in federal court."  *CEnergy-Glenmore Wind Farm #1, LLC v. Town of Glenmore*, 769 F.3d 485, 487 (7th Cir. 2014) (cleaned up).

Here, the City puts forth four potential rational bases for the Ordinance.  First, it notes that the Building is a Chicago landmark that the City has a unique interest in preserving and protecting.  The City argues that the Ordinance was conceivably rational because DR-10 allows for slightly fewer dwelling units than DX-16 and people were prone to causing extensive property damage, throwing unlawful parties, trespassing on the building's roof, lobbing bottles, pieces of masonry, and debris from the Building onto neighboring streets, and spraying graffiti in the building's interior.  According to the City, "DR-10 zoning reduces the maximum permitted number of building occupants and thus might conceivably address or mitigate these problems."  Dkt. # 179, at 24. Second,  the City asserts that "DR zoning generally permits more uniform, manageable property uses than DX zoning" and "[e]nsuring that the property would be used in such ways, and would not include a chaotic hodgepodge of uses permitted under DX zoning, could conceivably aid building security and property managers in overseeing the building, which Pittsfield's own property manager acknowledge was a 'mess.'"  *Id*. Third, the City argues that to the extent the Ordinance prevented hotel use, doing so was conceivably rational given the myriad problems associated with the Building, which would have posed dangers and other problems to hotel patrons and hotel management companies and tarnished the reputation of the hotel industry within Chicago.  Fourth, the City argues that Pittsfield was repeatedly unresponsive to the

34

City's efforts to restore the Building during a receivership proceeding[14], and therefore it was conceivably rational for the City to employ alternative strategies to safeguard the landmark building.

In its response, Pittsfield does not engage with any of the City's asserted rational bases. Instead, it incorrectly states that the City "fail[ed] to discuss a preliminary inquiry—whether the government action was arbitrary and capricious[,]" before arguing that there were conceivable rational bases for the Ordinance. But Pittsfield cites no authority for this rigid, step-by-step test. The relevant case law, rather than suggesting that a court must determine whether a regulation was "arbitrary and capricious" before reaching the question of whether there was a rational basis for it, instead asks those questions in tandem. *See*, *e.g.*, *Lee*, 330 F.3d at 467; *CEnergy-Glenmore Wind Farm*, 769 F.3d at 488 (to constitute a due process violation, "the action must have been 'arbitrary and capricious' or 'random and irrational.'") (cleaned up).

Although Pittsfield makes arguments regarding why the Ordinance may have been "enacted arbitrarily as a result of political animus," Dkt. # 189, at 23, its failure to respond to any of the City's proposed rational bases constitutes waiver. *See U.S. v. Holm,* 326 F.3d 872 (7th Cir. 2003) ("It is not the obligation of this court to research and construct the legal arguments open to parties," and "perfunctory and undeveloped arguments" are waived.); *Rose v. United States*, 929 F. Supp. 305, 309 (N.D. Ill. 1996)

---

[14] Illinois circuit judges placed the Building into receivership in 2011 and 2017. *See City of Chi. v. Pittsfield Building*, No. 11-M1-401448; *City of Chi. v. Jewelry Tower, LLC et al.*, 17-M1-401501.

35

("the paucity of argument on this issue in her response brief essentially waives the claim") (citing *Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir. 1994)).

Furthermore, animus is not enough. "[A] given action can have a rational basis and be a perfectly logical action for a government entity to take even if there are facts casting it as one taken out of animosity." *Miller v. City of Monona*, 784 F.3d 1113, 1121 (7th Cir. 2015). "If we can come up with a rational basis for the challenged action, that will be the end of the matter—animus or no." *Fares Pawn, LLC v. Ind. Dep't of Fin. Insts.*, 755 F.3d 839, 845 (7th Cir. 2014); *Flying J, Inc. v. City of New Haven*, 549 F.3d 538, 548 (7th Cir. 2008) ("It is only when courts can hypothesize no rational basis for the action that allegations of animus come into play."). Even if Alderman Reilly exhibited animus towards Pittsfield, that is insufficient since the Ordinance was passed by the City Council as a whole, and not Alderman Reilly alone. *See Strauss v. City of Chi.*, 346 F. Supp. 3d 1193, 1206–07 (N.D. Ill. 2018); *see also Flying J*, 549 F.3d at 548 (government action receives "presumption of rationality").

The City has suggested several bases that we find conceivably rational, and summary judgment is therefore granted as to Pittsfield's substantive due process claims.

## CONCLUSION

Pittsfield's motion for summary judgment [170] is granted-in-part and denied-in-part, and the City's motion for summary judgment [177] is granted-in-part and denied-in-part. Pittsfield's motion is granted as to as to Count I and the City's first, second, third, fourth, fifth, seventh, and eighth affirmative defenses but denied as to

36

Count II and the City's sixth affirmative defense.  The City's motion is denied as to Count I and granted as to Counts II, III, IV, and V.  Status hearing set for March 14, 2024 at 10:10 a.m. to discuss how the parties wish to proceed with the damages portion of this case and whether resolution is possible.  It is so ordered.

_____
Charles P. Kocoras
United States District Judge

Date: February 13, 2024