## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

PITTSFIELD DEVELOPMENT, LLC,    )
et al.,    )
    )
             Plaintiffs,    )
    )
        v.    )    17 C 1951
    )
CITY OF CHICAGO,    )
    )
             Defendant.    )

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Plaintiffs Pittsfield Development, LLC ("Development"), Pittsfield Residential II, LLC ("Residential"), and Pittsfield Hotel Holdings, LLC ("Hotel") (collectively, "Pittsfield") brought this case alleging unconstitutional takings of property interests and substantive due process violations by Defendant City of Chicago ("City"). The Court issued a ruling on the parties' cross-motions for summary judgment on February 13, 2024, granting summary judgment in Pittsfield's favor on Count I and several of the City's affirmative defenses, and granting summary judgment in the City's favor on Pittsfield's remaining claims, Counts II–V. Dkt. # 225; Dkt. # 226. The City now seeks reconsideration of that decision as to Count I, asserting that summary judgment should be entered in the City's favor rather than Pittsfield's. Dkt. # 227 ("Reconsideration

Motion"). For the following reasons, the Reconsideration Motion is granted-in-part and denied-in-part.

## BACKGROUND

We presume familiarity with the Court's summary judgment opinion, Dkt. # 226 ("February Order"), and incorporate by reference its factual findings. We will reference pertinent facts where necessary.

Count I alleges the City effected an unconstitutional taking under the Fifth Amendment of Hotel's property interest in floors 2–9 of the Pittsfield Building ("Hotel Property"). The City did so, Hotel alleged, by enacting a zoning ordinance in 2016 which changed the zoning of the Pittsfield Building from DX-16 to DR-10 ("Ordinance"). While DX-16 allowed for hotel use, DR-10 zoning did not permit building use as a hotel or office. This threw a wrench in Pittsfield's plans to develop a hotel on the Hotel Property ("Hotel Development Project"), for which Pittsfield previously received permission from the City in the form of an advisory opinion that a 210-room hotel in the Hotel Property was allowed under DX-16, the zoning then in place, as well as a building permit for the Hotel Development Project ("Permit").

The February Order assessed whether the Ordinance constituted a total regulatory taking of the Hotel Property under *Lucas v. S.C. Coastal Council*, 505 U.S. 1003 (1992). We found that the Ordinance constituted a *Lucas* taking because it "'denied all economically beneficial or productive use' of the Hotel Property" and explained our reasoning as follows:

2

> Pittsfield obtained the City's blessing to move forward with the Hotel Development Project. It then removed tenants, expended money, and demolished several floors of the Hotel Property in reliance on that blessing. The City then changed its mind and expressed its reversal in multiple ways, i.e., [Alderman] Reilly introducing the Ordinance, Reilly's letter to Solis stating the Ordinance was intended to stop the Hotel Development Project and throw the Building into non-conformance, and the City enacting the Ordinance. Unable to move forward with the Hotel Development Project, the purpose for which Hotel made its financial decisions regarding the Hotel Property, the Hotel Property lost its economic value to Hotel.

February Order, at 25. Having found a taking under *Lucas*, we did not assess Count I as a partial regulatory taking under *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978).

The City challenges the Court's ruling that Hotel showed a *Lucas* taking of the Hotel Property, and asks the Court to amend the February Order "to vacate the grant of summary judgment to Plaintiff Hotel on its takings claim in Count I of the Amended Complaint, and to enter summary judgment in favor of the City on that count." Dkt. # 227, at 1.

## LEGAL STANDARD

Because the City seeks reconsideration of a non-final order, the Court analyzes its motion under Federal Rule of Civil Procedure 54(b). Motions for reconsideration under Rule 54(b) are disfavored and generally "serve the limited function of correcting manifest errors of law or fact." *Slick v. Portfolio Recovery Assocs., LLC*, 111 F. Supp. 3d 900, 902 (N.D. Ill. 2015) (cleaned up). A manifest error occurs "when a district court has patently misunderstood a party, or has made a decision outside the adversarial

3

issues presented to the Court by the parties, or has made an error not of reasoning but of apprehension." *Ford v. City of Rockford*, 2019 WL 2011104, at *1 (N.D. Ill. 2019). "Such problems rarely arise and the motion to reconsider should be equally rare." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990) (citation omitted). Furthermore, "motions to reconsider are not appropriate vehicles to advance arguments already rejected by the Court or new legal theories not argued before the ruling[.]" *Schilke v. Wachovia Mortg., FSB*, 758 F. Supp. 2d 549, 554 (N.D. Ill. 2010), *aff'd on other grounds sub nom. Cohen v. Am. Sec. Ins. Co.*, 735 F.3d 601 (7th Cir. 2013) (cleaned up).

District courts have wide discretion in deciding whether to reconsider an interlocutory order. *See Hossfeld v. Allstate Ins. Co*., 2024 WL 325337, at *3 (N.D. Ill. 2024) ("Rule 54(b) [] bestows 'sweeping authority upon the district court to reconsider' a non-final order.") (quoting *Galvan v. Norberg*, 678 F.3d 581, 587 n.3 (7th Cir. 2012)); *FDIC v. Mahajan*, 2013 WL 3771419, at *2 (N.D. Ill. 2013) ("Reconsideration of an interlocutory order is committed to the sound discretion of this Court, and is reviewed very deferentially and will only be reversed upon a showing that the Court abused its discretion.").

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere

scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## **DISCUSSION**

The City first argues that the Court's factual findings and "proper apprehension of the City's summary judgment arguments and submissions" preclude Hotel's takings claim under a *Lucas* theory. Dkt. # 227, at 3. That is because, the City argues, the undisputed facts show the Ordinance "did not eliminate all—or even most— economically beneficial uses of the Hotel Property" as required by *Lucas*. *Id*. Rather, "the Hotel Property retained a variety of economic uses and substantial value even after" the Ordinance. *Id*. For example, the City's brief explained that DR-10 zoning "still allowed for scores of economically viable permitted and special uses appropriate for the downtown district, such as luxury residential, student housing, restaurants, and retail sales uses." *Id*. at 4 (cleaned up). And the Court found that even after the

5

Ordinance, the Hotel Property could be used to build residential units and a buyer still wanted to purchase the Pittsfield Building to do so. Furthermore, the Pittsfield Properties sold for $20.8 million in a bankruptcy sale, $6.45 million of which was attributable to the Hotel Property.

Next, the City argues that the February Order "misapprehended binding legal authority that precludes Hotel's takings claim" under *Lucas*. *Id*. at 8. Specifically, the Seventh Circuit and Supreme Court have held that in a takings analysis, "it is inappropriate to consider only the loss due to prohibited uses, without also considering 'the many profitable uses to which the property could still be put.'" *Id*. (quoting *Goodpaster v. City of Indianapolis*, 736 F.3d 1060, 1074 (7th Cir. 2013)). And "it is not sufficient for a plaintiff to claim that the property is valueless *to the plaintiff*. The plaintiff must instead demonstrate a 'total loss' or 'permanent obliteration of value' of the property." *Id*. (quoting *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 535 U.S. 302, 330 (2002)); *see also id*. ((quoting *Murr*, 582 U.S. at 405) ("even 'a landowner with 95 percent loss may not recover' under *Lucas* because 5 percent of the value remains.").

Pittsfield opposes the City's motion to reconsider, maintaining the Court properly concluded that a *Lucas* taking occurred. It argues that the City "continues to rehash old arguments that have previously been rejected by the Court" and "fails to properly address its failure to rebut factual assertions by Pittsfield that the [] Ordinance rendered the Hotel Property to be a useless and burdensome liability that denied Hotel

all beneficial economic use thereof." Dkt. # 230, at 3–4. Pittsfield also asserts that the case at bar is distinguishable from the precedent cited by the City. *Id*. at 8–11.

We agree in part with the City that amendment of the February Order is warranted. Based on the undisputed facts and controlling case law, a taking of the Hotel Property under *Lucas* may not have occurred. However, rather than finding that a *Lucas* taking is foreclosed, we find that a dispute of material fact exists as to whether other economically beneficial uses of the Hotel Property were available to Hotel.

As noted in our summary judgment ruling, a *Lucas* taking requires "the complete elimination of a property's value." February Order, at 25 (quoting *Lingle v. Chevron*, 544 U.S. 528, 539–40 (2005); *see also id*. ((quoting *Lucas*, 505 U.S. at 1017) ("total deprivation of beneficial use is, from the landowner's point of view, the equivalent of a physical appropriation."). We recounted the undisputed facts in the Background section of the February Order which included that "Prospective Buyer still wanted to purchase the Building even after learning about the Ordinance because it wanted to build residential units, including luxury residential units, which Lynd viewed as an economically viable use for the property." February Order, at 8. It also included that $6.45 million of the Pittsfield Properties' sale price was allocated to Hotel for the Hotel Property. *Id*. at 14. Furthermore, the Court can also take judicial notice of laws and ordinances. *See Demick v. City of Joliet*, 108 F. Supp. 2d 1022, 1025 (N.D. Ill. 2000). DR-10 zoning allowed for uses such as luxury residential units, student housing, restaurants, and retail. *See* Dkt. # 179, at 18 (citing MCC 17-4-0207). These facts show

7

that the Ordinance may not have deprived Hotel of all beneficial use of the Hotel Property.

However, Pittsfield sufficiently raises a dispute of material fact on this point. It cites evidence and argument that although certain other uses may have been *permitted* under DR-10, they were not *feasible*. Dkt. # 230, at 4–5. For example, it is undisputed that "DX-16 is the highest designation (providing for a higher number of uses and greater residential density than lower DX designations, such as DX-3) for a DX district which promotes vertical mixed use projects that contain active ground floor uses, with no minimum frontage requirements, no front set-backs, no side set-backs, an exemption from rear set-back standards, and no building height limits." February Order, at 4. Other uses may not have been economically feasible, and Pittsfield put forth evidence that the Ordinance rendered the Hotel Property a "useless and burdensome" liability that "could no longer generate sufficient income to sustain their operations," and Pittsfield stopped renewing leases and removed rent-paying tenants. *Id*. at 7. Furthermore, Hotel had begun demolition on floors 7 and 8 of the Hotel Property. *Id*. at 8. And not all sales qualify as "economic uses" for purposes of a *Lucas* analysis— "[w]hen there are no underlying economic uses, it is unreasonable to define land *use* as including the sale of the land." *Lost Tree Vill. Corp. v. United States*, 787 F.3d 1111, 1117 (Fed. Cir. 2015). The question of whether a complete regulatory taking of the Hotel Property under *Lucas* occurred is one for the jury.

We therefore amend the February Order to, as to Count I under the *Lucas* framework, deny summary judgment to Pittsfield. The denial of summary judgment in the City's favor remains in place.

Having amended our ruling on the *Lucas* theory, we must now proceed with Count I under the *Penn Central* analysis. *See* February Order, at 25 (not proceeding with *Penn Central* analysis as to Pittsfield's motion for summary judgment because *Lucas* taking was found); *id.* at 28 (not analyzing Count I as to the City's motion for summary judgment because we already granted Pittsfield's motion on Count I). We turn back to the parties' summary judgment briefing, and assess their arguments as to Pittsfield's and the City's summary judgment motions in turn.

A partial regulatory taking under *Penn Central* may be found when a regulation impedes the use of property without depriving the owner of all economically beneficial use, based on a "complex of factors": (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the government action. *Murr v. Wisconsin*, 582 U.S. 383, 387 (2017).

## I. Pittsfield's Motion

As to whether Hotel can show that a partial taking of the Hotel Property occurred, Pittsfield argues only that Hotel "was unable to sell the Hotel Property because of the [] Ordinance" because "[a]ttempts to sell to parties who submitted a LOI, or later, at an auction, were unsuccessful." Dkt. # 170, at 11.

9

The City makes several arguments in response. First, it argues that the economic impact factor "primarily turns on consideration of the fair market value of the allegedly taken property before and after the challenged regulation," and that Pittsfield's motion "offers no account whatsoever on the fair market value of [the Hotel Property] before and after the Ordinance." Dkt. # 192, at 9. In reply, Pittsfield states only that the City's cited cases are irrelevant because the Hotel Property was "rendered worthless by the downzoning", and that "the fair market value of [] the Hotel Property before the downzoning [is] not at issue. . . . It has been demonstrated that [the Hotel Property] had no value after the downzoning." Dkt. # 195, at 7. As discussed with respect to *Lucas*, while Pittsfield set forth some facts regarding the Hotel Property's loss in value after the Ordinance, it has not demonstrated an absence of material fact dispute on that point.

As to the reasonable investment-backed expectations factor, Pittsfield stated only that Hotel expected to "have a real property with a hotel developed thereon, along with the inherent financial value thereof" and instead was "left with real property that was left largely vacant after tenants were relocated and could not be replaced after the Building was downzoned." Dkt. # 170, at 11. In response, the City raises genuine fact disputes as to whether it was actually Development, and not Hotel (who brings this claim), who made expenditures and changes in position in expectation of a hotel development. Furthermore, the City raises factual disputes about the invoices Pittsfield cites as evidence of its expenses in furtherance of the Hotel Development Project,

10

including testimony from Pittsfield's general contractor about unpaid invoices and money owed to him.

Turning to the "character of the government action" factor, Pittsfield argues only that the Ordinance was "draconian" and that the Hotel Property was "confiscated" by the Ordinance. Again, Pittsfield has failed to demonstrate a lack of factual dispute regarding whether the Hotel Property was "useless" after the Ordinance, i.e., that there were no other possible uses for the property besides a hotel.

Material factual disputes remain regarding the *Penn Central* factors and Pittsfield's motion for summary judgment as to Count I is denied.

## II. The City's Motion

We also deny the City's summary judgment motion regarding the *Penn Central* analysis because there are genuine disputes of material fact as to all three factors.

### a. The Proper "Denominator" For Measuring Economic Impact

As to the first *Penn Central* factor, the City argued that the proper "denominator" for evaluating economic impact is Pittsfield's collective interests in the Building plus the Permit, rather than the Permit or the Hotel Property on their own, and that the economic impact on these interests was too small to support finding that a taking occurred. And even if the Permit and Hotel Property are assessed separately, the City argued, this factor still does not weigh in favor of establishing a taking. While the Permit is not at issue in this Opinion, we will assess City's denominator arguments as

11

written.  But, as described below, we decline to analyze all of Pittsfield's real property interests collectively and/or with the Permit.

The Supreme Court has noted that takings cases can present a preliminary question "that is linked to the ultimate decision whether a regulatory taking has occurred: What is the proper unit of property against which to assess the effect of the challenged government action?"  *Murr*, 582 U.S. at 395.  "Put another way, because our test for regulatory taking requires us to compare the value that has been taken from the property with the value that remains in the property, one of the critical questions is determining how to define the unit of property whose value is to furnish the denominator of the fraction."  *Id*. (cleaned up).  The Supreme Court further stated:

> [N]o single consideration can supply the exclusive test for determining the denominator.  Instead, courts must consider a number of factors.  These include [(1)] the treatment of the land under state and local law; [(2)] the physical characteristics of the land; and [(3)] the prospective value of the regulated land.  The endeavor should determine whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts.  The inquiry is objective, and the reasonable expectations at issue derive from background customs and the whole of our legal tradition.

*Id*. at 397.

The City argues that Pittsfield's (i.e., all three Plaintiffs') collective interests in the Building, including the Permit, are the appropriate denominator for the Court's takings analysis.  As to the first *Murr* factor, the City asserts that "state and local [law] treated Plaintiffs' collective interests in the building similarly."  Dkt. # 179, at 14.  For

12

example, Pittsfield's properties were collectively identified under a single PIN number. The Ordinance rezoned the entirety of the Building rather than discrete interests, and the City designated the entire building as a Chicago Landmark in 2002.

As to the second factor, the City argues that Pittsfield's "interests in the [B]uilding were physically similar" in that their respective floors were within the same high-rise and used the same lobby, entrances, exits, and elevators, and their floors were overseen by the same security officer, property manager, and general contractor. They further had "common historical and architectural significance" since they were part of the same landmark. *Id*. at 15.

The City argues that the third factor, prospective value in the regulated land, favors treating Pittsfield's interests as one because "the impact of the Ordinance was felt by the parcel as a whole, not just by discrete portions." *Id*. Development purchased the entire Pittsfield Building in 2000, and in 2017, Pittsfield collectively sold their assets together.

The City also seems to argue that Pittsfield's interests should be considered collectively because of certain overlap between them, such as that their interests were collectively sold in a delinquent tax sale, and that Pittsfield alleged they are "related entities" with common membership and control, filed suit together through the same counsel, and identified Danial (Pittsfield's manager) as their 30(b)(6) representative.

Finally, the City contends that the Permit should be considered together with Pittsfield's collective real property interests. As stated on the Permit itself, local law

13

prohibited the Permit from being sold or otherwise transferred. The City asserts that the only way Hotel could transfer the Permit would be to tender the real property in the Building.

Pittsfield responds that the Hotel Property should be considered as a single parcel, separate from the rest of the Building, because only Hotel asserts takings claims against the City (and not Residential or Development) so it would be improper to consider all of their interests together. Pittsfield cites various facts to support its position, such as that Hotel is the record owner of the Hotel Property, Hotel took title to the Hotel Property from Development and Residential for the purpose of developing a hotel, Scheinblum and CHP were brought into Hotel for the hotel development and were not part of Development or Residential, the Permit was issued to Hotel and not Development or Residential, and the Hotel Property did not have residential tenants, unlike Residential's property. Pittsfield also argues that the facts of *Murr* are distinguishable because there, a *single owner* owned the two adjacent lots at issue.

Pittsfield further argues that the City has not shown the Permit should be considered together with any real property interests because the case cited by the City, *Goodpaster*, 736 F.3d at 1074, merely stands for the proposition that just compensation should be determined based on all possible uses for a property, and not just the way the owner had planned to use the property. This, Pittsfield argues, does not logically lead to the conclusion that the Permit should be analyzed together with the real property interests. Furthermore, Pittsfield contends that the relevant parcel may be a subset of a

14

larger parcel when the owner develops distinct parcels at different times and treats them as distinct economic units, which was the case for the Hotel Property.  Dkt. # 189, at 16 (citing *Palm Beach Isles Assocs. v. U.S.*, 208 F.3d 1374, 1381 (Fed. Cir. 2000), and *Lost Tree Vill. Corp. v. U.S.*, 707 F.3d 1286, 1293 (Fed. Cir. 2013)).

For several reasons, we decline to consider all of Pittsfield's respective real property interests collectively as the denominator for our analysis.  First, we find the City has not met its burden on this issue.  It cites no authority for the proposition that interests can be considered together when they are owned by separate entities and the separate entities do not each bring a takings claim for their respective interests.  The case law cited by the City generally refers to a single landowner or group bringing the takings claim.[1]  And even if, as the City seems to argue, we could consider Pittsfield's interests collectively *if* the Pittsfield entities are sufficiently related, Pittsfield has raised a dispute of material fact as to that point.  For example, they point to the fact that Hotel, Development, and Residential had different members, i.e., Scheinblum and CHP were part of Hotel only.

Furthermore, putting aside the relationship between the Pittsfield entities, we decline to consider all of Pittsfield's interests together because "even when contiguous land is purchased in a single transaction, the relevant parcel may be a subset of the original purchase where the owner develops distinct parcels at different times and treats

---

[1] In *Tahoe-Sierra*, an association of landowners as well as individual owners brought the claim together.  535 U.S. at 312.

the parcels as distinct economic units." *Lost Tree*, 707 F.3d at 1293 (citing *Palm Beach Isles*, 208 F.3d at 1381, and *Lovelardies Harbor, Inc. v. U.S.*, 28 F.3d 1171, 1181 (Fed. Cir. 1994)). Pittsfield has raised genuine disputes of material fact as to its development of the Hotel Property separately from the rest of the Building and its treatment as a distinct economic unit, for example the formation of Hotel specifically to develop a hotel on the Hotel Property, Hotel applying for and obtaining the Permit as to the Hotel Property only, demolishing certain floors of the Hotel Property for the Hotel Development Project, having economic expectations for the Hotel Property that were separate from the economic expectations of the rest of the Building, and Hotel's efforts to find financiers, investors, and hotel partners specifically for the Hotel Development Project. Again, "[n]o single consideration can supply the exclusive test for determining the denominator[,]" and the Court's analysis must take into consideration "whether reasonable expectations about property ownership would lead a landowner to anticipate that his holdings would be treated as one parcel, or, instead, as separate tracts." *Murr*, 582 U.S. at 397. The question of Hotel's expectations about its ownership of the Hotel Property is one for the jury.

We also decline to consider the Permit together with any real property interests. The Permit is entirely different in nature and treated differently from real property by state and local law. *Id*. The City cites no supportive authority for finding the Permit and the real property interests should be analyzed as one.

16

For the foregoing reasons, the Court will consider the economic impact on the Hotel Property as separate from Development and Residential's real property interests and the Permit.

### b. Economic Impact

As to the Hotel Property, the City argues that the economic impact factor weighs in its favor because the Ordinance permitted Hotel a "reasonable return on its investment." Dkt. # 179, at 18 (citing *Penn Central*, 438 U.S. at 136). That the Ordinance may have prevented future hotel use for the Hotel Property, the City continues, is not the only consideration—"it is inappropriate to consider only the loss due to prohibited uses, without also considering 'the many profitable uses to which the property could still be put.'" *Id*. (citing *Goodpaster*, 736 F.3d at 1074). Because DR-10 zoning provides for "scores of economically viable permitted and special uses[], such as luxury residential, student housing, restaurants, and retails sales," the economic impact on the Hotel Property was insufficient to find a taking occurred. *Id*. The City also cites the fact that its expert, considering all permitted and special uses allowed under DX-16 and DR-10 zoning, found only a 10% diminution in value of the Hotel Property before and after the Ordinance, while Pittsfield's expert did not opine on the economic impact of the Ordinance at all. Dkt. # 179, at 18–19; *see also* Dkt. # 223. And Lynd was willing to purchase Pittsfield's interests at the same price before and after the Ordinance. Finally, the City asserts that Pittsfield has adduced no evidence of a decrease in value of the Hotel Property after the Ordinance.

As discussed above, the other uses allowed under DR-10 zoning may not have been feasible.[2]  Pittsfield also argues that "the record is replete with [] evidence" supporting a reduction in value, and cites its expert's report, Lynd's purchase offer, "the purchase proposals submitted by CBRE before the property was downzoned, the Hotusa purchase option, the failure to be able to sell Plaintiffs' interests in a private auction following downzoning, and the subsequent bankruptcy liquidation."  Dkt. # 189, at 19. Pittsfield cites six asserted facts, which are summarized below:

- On August 3, 2015, Pittsfield entered into a contract with the Prospective Buyer, an entity created by Lynd, that was interested in converting the Building to residential use, for $36 million.

- Alderman Reilly stated in a letter dated March 9, 2016, that the Ordinance was introduced to "halt" and "hit the pause button on" the Hotel Development Project and to "throw [the Building] into non-conformance."

- CBRE procured letters of intent or offers to purchase the Building from DeBartolo Properties, LLC ($79 million), Pramana Global, LLC ($83 million), Brijus Capital, LLC ($72.3 million), and Akara Partners, LLC ($83.5 million). None of these offers progressed to a contract to purchase.

- Interest from potential purchasers of the Building decreased after the Ordinance was enacted.[3]

---

[2] Pittsfield cites two asserted facts to say that "the densities allowed under DR-10 prohibited [Hotel] from using its real property for such uses." Dkt. # 189, at 18 (citing Dkt. # 190 ¶¶ 5–6). However, these asserted facts are not properly supported and are thus inadmissible. The vague and conclusory statements regarding "lower allowed densities" and "more restrictive use", based on the equally conclusory declaration of Robert Danial which establishes no foundation for his knowledge and puts forth legal conclusions and/or impermissible expert testimony from a lay witness, are not sufficient support.

[3] We include here only the portion of the cited fact that is undisputed.

18

- Hotel engaged in discussions with Hotusa which resulted in an executed letter of intent for Hotusa to retain a purchase option to acquire the future hotel for $350,000 per key which, with 191 rooms, totaled $66,850,000.

- On March 26, 2017, the Bankruptcy Court ordered Pittsfield to sell its real estate interests in the Building. They sold at an auction on June 27, 2017, for $20.8 million.

Dkt. # 190 ¶¶ 27, 35, 38–40, 49. Nadolny, Pittsfield's expert, also valued a pre-Ordinance completed Kimpton hotel on the Hotel Property at $70.4 million. Dkt. # 174-1.

While this evidence does not all speak specifically to the Hotel Property's diminution in value (as opposed to the Building's), it is sufficient to raise a dispute of material fact as to the Ordinance's economic impact on the Hotel Property's value. Of particular import is the Building's sale price at the bankruptcy auction compared to the evidence of its pre-Ordinance value. A jury will have to weigh this evidence against the City's expert's opinion and other evidence raised by the City.

### c. Reasonable Investment-Backed Expectations

The City argues that a reasonable investor would not have expended the substantial amounts of money on the Hotel Development Project that Hotel did. Hotel "did not even own the subject property due to an enormous tax delinquency," and a reasonable investor would not have removed the few rent-paying tenants it had "in anticipation of building out a pipe dream hotel." Dkt. # 179, at 20–21. Furthermore, it was "unreasonable to assume that [Hotel] would be able to get all required licenses and permits to operate a speculative hotel after making no efforts to obtain those

19

authorizations," and "Hotel's expectations were all the less reasonable given the egregious mismanagement of the building." *Id*. at 21. Pittsfield counters that it was reasonable to expect to develop a hotel on the Hotel Property when the City issued the Permit to do so, and it was not reasonably expected that the City would downzone the Hotel Property shortly thereafter. The question of what investment-backed expectations were "reasonable" is one for the jury.

### d. Character of the Government Action

Finally, the City argues in a conclusory fashion, with no citation to evidence, that it "acted in a manner that balanced burdens and benefits of economic life for the common good" and "regulated a building that had become a menace to the community while still permitting the owners of the building to engage in a wide array of profitable and economically viable property uses." Dkt. # 179, at 22. In response, Pittsfield cites case law finding takings occurred where property was effectively "confiscated" as well as evidence that the purpose of enacting the Ordinance was to "halt" the Hotel Development Project and "throw [the Building] into non-conformance." Dkt. # 189, at 20–21. This is enough to raise a dispute of material fact as to whether the Ordinance was akin to a "physical invasion by the government" as opposed to an interference meant to "promote the common good." *See Penn Central*, 438 U.S. at 124.

Because Pittsfield has raised genuine disputes of material fact as to all three *Penn Central* factors, we deny City's motion for summary judgment as to the Hotel Property.

20

In sum, to the extent the Reconsideration Motion seeks reconsideration of the Court's grant of summary judgment in Hotel's favor on Count I as to a *Lucas* taking, the motion is granted. But it is denied to the extent it seeks summary judgment in the City's favor on Count I. Disputes of material fact remain as to Count I under both the *Lucas* and *Penn Central* analyses.

## **CONCLUSION**

For the foregoing reasons, the Court grants in part and denies in part the City's Reconsideration Motion [227]. A telephonic status hearing is set for 2/4/2025 at 9:50 a.m. to discuss preparation for trial and whether resolution is possible.

It is so ordered.

Charles P. Kocoras
United States District Judge

Date: January 7, 2025